**VALLEY REALTY COMPANY, Plaintiff,**

v.

**UNITED STATES, Defendant.**

No. 10–256C.

United States Court of Federal Claims.

Dec. 20, 2010.

Lawrence M. Magdovitz, II, Law Offices of Lawrence Magdovitz, Cordova, Tennessee, for the plaintiff.

Jeffrey A. Regner, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for the defendant. With him were Bryant G. Snee, Deputy Director, Jeanne E. Davidson, Director, Commercial Litigation Branch, and Tony West, Assistant Attorney General, Civil Division.

## OPINION

HORN, Judge.

### FINDINGS OF FACT

The issue presented by this case concerns which party should be held responsible for the cost of repairs required to be made to the sewerage system in a leased, United States Post Office facility in Birchwood, Tennessee. The facility is owned by plaintiff, Valley Realty Company (Valley Realty), the Lessor, and was leased by the United States Postal Service (the Postal Service), the Lessee. The original lease term of ten years began June 1, 1983, and ended May 31, 1993. Thereafter, the Lease was extended by the parties in five year increments. The current Lease extension between Valley Realty and the Postal Service runs from June 1, 2008 to May 31, 2013. The base lease term and cumulative five year extensions will total thirty years in 2013 at the end of the current

extension. Sewerage[1] at the post office facility is accomplished not through a public waste system, which is unavailable at the site, but through an attached septic tank system.

In late December 2008, the Postal Service discovered roots growing into the main sewer line. On January 15, 2009, the Postal Service sent a letter to Valley Realty identifying the problem as "Roots growing in drain field caused septic problems (RotoRooter took care of back-up . . .)." The January 15, 2009 letter also requested that plaintiff make the necessary repairs to the system. The letter stated: "Should you fail to complete the work, the Postal Service has the legal right to contract for the work and the cost, plus any administrative fee and appropriate interest, will be reimbursed by you or deducted from your rent."

Valley Realty declined to make the repairs. Plaintiff's counsel responded to the Postal Service's letter by email on February 19, 2009:

> The problem at Birchwood is not that we are not providing septic "service." There is a septic system. It was provided at the outset of the lease. It needs repair now. That is the USPS [United States Postal Service] responsibility under the Maintenance rider which states that any repairs, other than to structure or roof, are the responsibility of the USPS. Based on the maintenance rider, the Lessor is not responsible for the requested repair at the Birchwood, TN Post Office.
>
> Further, under the Contract Disputes Act, this is a formal request for a final contracting officer's decision regarding this outstanding maintenance issue at Birchwood, TN.

No repairs were made to the sewerage system by either party during the first nine months of 2009. On approximately August 3, 2009, the Postal Service discovered water leaking from the toilets in the facility when the toilets were flushed. The Postal Service

called Roto–Rooter, which concluded that the septic tank did not require cleaning, but that the main sewerage line was emptying into the ground instead of into the septic tank. The toilets no longer accepted waste.

In an August 5, 2009 letter to plaintiff, the Postal Service contracting officer recounted the Postal Service's earlier, January 15, 2009 letter to plaintiff concerning roots growing into the main sewer line, and also the August 3, 2009 notification, that "[w]ater gushes out of the toilet when flushed. . . ." The contracting officer described the problem as an "emergency because of health or safety issues requiring immediate attention." The August 5, 2009 letter continued: "In accordance with Paragraphs 6 & 25 of the Lease, the lessor is responsible to provide sewerage *service* to the building and is responsible for such until a public system becomes available and the lessor provides hookup to same." (emphasis in original).

On September 10, 2009, the Postal Service sent plaintiff a follow-up letter reciting the history of the problem and indicating that, since plaintiff had not completed the required repairs, the Postal Service would do so, would seek reimbursement from plaintiff for the cost of the work, plus any administrative costs and interest, and that a rent deduction will be taken from the rent due under the terms of the Lease.

The Postal Service retained Prime Contractors, Inc. (PCI) to make the repairs. PCI determined that the sewer line between the building and the septic tank was broken at the inlet baffle of the septic tank, creating a sink hole which allowed the waste to enter the soil area and allowed soil to enter the septic tank. PCI's invoice, dated October 5, 2009, stated:

*Sewer line Repairs:*

● Investigated water gushing when toilets are flushed: Discovered that the sewer line between the building and septic is broken at the inlet baffle of the septic tank, creating a sink hole allowing the

---

1. Sewerage is defined as "the removal and disposal of sewage and surface water by sewers." *Webster's Ninth New Collegiate Dictionary* 1078 (1983). "In construing statutory language, we look to dictionary definitions published at the time that the statute was enacted." *Res. Conservation Grp., LLC v. United States,* 597 F.3d 1238, 1243 (Fed.Cir.2010) (footnote omitted); *see also Nielson v. Shinseki,* 607 F.3d 802, 805–06 (Fed. Cir.2010).

waste to enter the soil area and soil entering the septic tank:

*We need to perform the following work:*

- Remove the septic tank lid and pump tank:
- Clean & replace inlet & out let [sic] baffles for proper operation:
- Saw cut approximately 10′ × 2′ of existing asphalt surface, excavate existing sewer line and replace approximately 10′ of 4″ sewer line and properly connect to existing septic inlet baffle:
- Install proper cleanouts on inlet and outlet sewer lines:
- Rod out field lines at outlet baffle:
- Back fill excavated area with compacted stone and dirt:
- Asphalt Pave over the excavated area disturbed by above noted work:
- Additional Work: Replace (2) Septic Tank Concrete Lids:

The Postal Service computed the sewerage system repair costs at $5,388.67. The direct cost of the repair by PCI was $5,318.67. Project manager administrative costs were calculated at $70.00 (2 hours at $35.00 per hour). Plaintiff has waived "any argument that the cost was not reasonable and necessary."

In a December 8, 2009 letter to plaintiff, the Postal Service stated that the work was completed on October 5, 2009, and that if reimbursement in the amount of $5,388.67 was not received by January 7, 2010, that amount would be deducted from future rent payments to the Lessor. Plaintiff responded on December 18, 2009, stating: "According to the maintenance rider, the Lessor is responsible for providing the septic system not for repairs made to the septic system. Payment is denied. Therefore, it is inappropriate to deduct rent for these repairs." Plaintiff followed this with a letter, dated January 22, 2010, reiterating its position that the Maintenance Rider, Attachment "A" to the Lease states that plaintiff "is only responsible for providing the septic system at the outset of the lease not for repairs made to the septic system." Plaintiff's letter concluded that if the Postal Service nevertheless takes a rental deduction for the repairs, plaintiff will file a lawsuit in the United States Court of Federal Claims.

The Postal Service contracting officer issued a final decision on the matter on February 5, 2010. The contracting officer's decision recounted the history of the sewer problem: that roots were discovered "growing into the lines of the septic system," and that the "sewer line had disengaged from the tank causing the sewage to empty on the ground." The contracting officer continued by citing to paragraph 6 of the Lease (PS Form 7449), which states that the plaintiff, as Lessor, shall provide "water and sewerage *service* (if public systems are not available), all as described in the General Conditions, PS Form 7400–A." (emphasis by contracting officer). The contracting officer's final decision concluded that, although plaintiff was responsible for providing sewerage service and was given ample notice and opportunity to complete the required repairs to the sewerage system, plaintiff had failed to make the necessary repairs. The contracting officer's final decision indicated that $5,388.67 would be withheld from rent due plaintiff in monthly installments between April 1, 2010 and September 1, 2010. Plaintiff also was apprised of its appeal rights. Thereafter, plaintiff filed this lawsuit in the Court of Federal Claims.

The parties have stipulated to the material facts and have filed cross-motions for summary judgment, each seeking affirmance of its own interpretation of the words in the Lease. The parties jointly characterize the issue for the court as follows:

> Which party is responsible under the lease agreement for the $5,318.67 paid by the Postal Service and the $70 in administrative cost incurred by the Postal Service, for the repairs to the septic system at the property?

## DISCUSSION

Rule 56 of the Rules of the Court of Federal Claims (RCFC) is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed. R.Civ.P.) and is similar, both in language and effect. Both rules provide that summary judgment should be granted "if the plead-

ings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." RCFC 56(c)(1) (2010); Fed. R.Civ.P. 56(c)(2) (2010); *see also Alabama v. North Carolina,* — U.S. ——, 130 S.Ct. 2295, 2308, 176 L.Ed.2d 1070 (2010); *Hunt v. Cromartie,* 526 U.S. 541, 549, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999); *Nebraska v. Wyoming,* 507 U.S. 584, 590, 113 S.Ct. 1689, 123 L.Ed.2d 317 (1993); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Consol. Coal Co. v. United States,* 615 F.3d 1378, 1380 (Fed.Cir.), *reh'g and reh'g en banc denied* (Fed.Cir. 2010); *1st Home Liquidating Trust v. United States,* 581 F.3d 1350, 1355 (Fed.Cir.2009); *Arko Exec. Servs., Inc. v. United States,* 553 F.3d 1375, 1378 (Fed.Cir.2009); *Casitas Mun. Water Dist. v. United States,* 543 F.3d 1276, 1283 (Fed.Cir.2008), *reh'g and reh'g en banc denied,* 556 F.3d 1329 (Fed.Cir.2009); *Moden v. United States,* 404 F.3d 1335, 1342 (Fed.Cir.), *reh'g and reh'g en banc denied* (Fed.Cir. 2005); *Am. Pelagic Fishing Co., L.P. v. United States,* 379 F.3d 1363, 1370–71 (Fed.Cir.), *reh'g en banc denied* (Fed.Cir. 2004), *cert. denied,* 545 U.S. 1139, 125 S.Ct. 2963, 162 L.Ed.2d 887 (2005). A fact is material if it will make a difference in the result of a case under the governing law. Irrelevant or unnecessary factual disputes do not preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 247–48, 106 S.Ct. 2505; *see also Scott v. Harris,* 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007); *Monon Corp. v. Stoughton Trailers, Inc.,* 239 F.3d 1253, 1257 (Fed.Cir.2001); *Walker v. United States,* 79 Fed.Cl. 685, 692 (2008); *Curtis v. United States,* 144 Ct.Cl. 194, 199, 168 F.Supp. 213, 216 (1958), *cert. denied,* 361 U.S. 843, 80 S.Ct. 94, 4 L.Ed.2d 81 (1959), *reh'g denied,* 361 U.S. 941, 80 S.Ct. 375, 4 L.Ed.2d 361 (1960).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence and determine the truth of the case presented, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 249, 106 S.Ct. 2505; *see, e.g., Schlup v. Delo,* 513 U.S. 298, 332, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995); *Ford Motor Co. v. United States,* 157 F.3d 849, 854 (Fed.Cir.1998) ("Due to the nature of the proceeding, courts do not make findings of fact on summary judgment."); *Dick Pacific/GHEMM, JV ex rel. W.A. Botting Co. v. United States,* 87 Fed.Cl. 113, 126 (2009); *Johnson v. United States,* 49 Fed.Cl. 648, 651 (2001), *aff'd,* 52 Fed.Appx. 507 (Fed. Cir.2002), *published at* 317 F.3d 1331 (Fed. Cir.2003); *Becho, Inc. v. United States,* 47 Fed.Cl. 595, 599 (2000). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 250–52, 106 S.Ct. 2505; *Jay v. Sec'y of Dep't of Health and Human Servs.,* 998 F.2d 979, 982 (Fed. Cir), *reh'g denied and en banc suggestion declined* (Fed.Cir. 1993). When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. *See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Rothe Dev. Corp. v. U.S. Dep't of Def.,* 262 F.3d 1306, 1316 (Fed.Cir.2001); *Hall v. Aqua Queen Mfg., Inc.,* 93 F.3d 1548, 1553 n. 3 (Fed.Cir.1996). In such a case, there is no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings.

In appropriate cases, summary judgment:

saves the expense and time of a full trial when it is unnecessary. When the material facts are adequately developed in the motion papers, a full trial is useless. "Useless" in this context means that more evidence than is already available in connection with the motion for summary judgment could not reasonably be expected to change the result.

*Dehne v. United States,* 23 Cl.Ct. 606, 614–15 (1991) (citing *Pure Gold, Inc. v. Syntex, Inc.,* 739 F.2d 624, 626 (Fed.Cir.1984)), *vacated on other grounds,* 970 F.2d 890 (Fed.Cir.1992);

*see also Metric Constr. Co., Inc. v. United States*, 73 Fed.Cl. 611, 612 (2006).

Summary judgment, however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 106 S.Ct. 2505; *see also Long Island Sav. Bank, FSB v. United States*, 503 F.3d 1234, 1244 (Fed.Cir.), *reh'g and reh'g en banc denied* (Fed.Cir. 2007), *cert. denied*, — U.S. ——, 129 S.Ct. 38, 172 L.Ed.2d 19 (2008); *Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955, 971 (Fed.Cir.), *reh'g and reh'g en banc denied* (Fed.Cir. 2001), *cert. denied*, 534 U.S. 1109, 122 S.Ct. 913, 151 L.Ed.2d 879 (2002); *Gen. Elec. Co. v. Nintendo Co.*, 179 F.3d 1350, 1353 (Fed.Cir.1999). In other words, if the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. at 587–88, 106 S.Ct. 1348; *Dethmers Mfg. Co. v. Automatic Equip. Mfg. Co.*, 272 F.3d 1365, 1369 (Fed.Cir.2001), *reh'g and reh'g en banc denied*, 293 F.3d 1364 (Fed.Cir.2002), *cert. denied*, 539 U.S. 957, 123 S.Ct. 2637, 156 L.Ed.2d 655 (2003); *Monon Corp. v. Stoughton Trailers, Inc.*, 239 F.3d at 1257; *Wanlass v. Fedders Corp.*, 145 F.3d 1461, 1463 (Fed. Cir.), *reh'g denied and en banc suggestion declined* (Fed.Cir. 1998); *see also Am. Pelagic Co. v. United States*, 379 F.3d at 1371 (citing *Helifix Ltd. v. Blok–Lok, Ltd.*, 208 F.3d 1339, 1345–46 (Fed.Cir.2000)). "However, once a moving party satisfies its initial burden, mere allegations of a genuine issue of material fact without supporting evidence will not prevent entry of summary judgment." *Republic Sav. Bank, F.S.B. v. United States*, 584 F.3d 1369, 1374 (Fed.Cir.2009); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 247–48, 106 S.Ct. 2505.

The initial burden on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact may be discharged if the mov-ing party can demonstrate that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Riley & Ephriam Constr. Co. v. United States*, 408 F.3d 1369, 1371 (Fed.Cir.2005); *Crown Operations Int'l Ltd. v. Solutia Inc.*, 289 F.3d 1367, 1377 (Fed.Cir.), *reh'g denied* (Fed.Cir. 2002); *Trilogy Commc'ns, Inc. v. Times Fiber Commc'ns, Inc.*, 109 F.3d 739, 741 (Fed.Cir. 1997) (quoting *Conroy v. Reebok Int'l, Ltd.*, 14 F.3d 1570, 1575 (Fed.Cir.1994), *reh'g denied and en banc suggestion declined* (Fed. Cir. 1995)), *reh'g denied and en banc suggestion declined* (Fed.Cir. 1997); *Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1569 (Fed. Cir.1997). If the moving party makes such a showing, the burden shifts to the nonmoving party to demonstrate that a genuine dispute regarding a material fact exists by presenting evidence which establishes the existence of an element essential to its case upon which it bears the burden of proof. *See Celotex Corp. v. Catrett*, 477 U.S. at 322, 106 S.Ct. 2548; *Florida Power & Light Co. v. United States*, 375 F.3d 1119, 1124 (Fed.Cir.2004); *Am. Airlines, Inc. v. United States*, 204 F.3d 1103, 1108 (Fed.Cir.2000); *see also Long Island Sav. Bank, FSB v. United States*, 503 F.3d at 1244; *Schoell v. Regal Marine Indus., Inc.*, 247 F.3d 1202, 1207 (Fed.Cir. 2001). However, "a non-movant is required to provide opposing evidence under Rule 56(e) only if the moving party has provided evidence sufficient, if unopposed, to prevail as a matter of law." *Saab Cars USA, Inc. v. United States*, 434 F.3d 1359, 1369 (Fed.Cir. 2006).

Even if both parties argue in favor of summary judgment and allege an absence of genuine issues of material fact, however, the court is not relieved of its responsibility to determine the appropriateness of summary disposition in a particular case. *Prineville Sawmill Co. v. United States*, 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed.Cir.1987)); *see also Chevron USA, Inc. v. Cayetano*, 224 F.3d 1030, 1037 n. 5 (9th Cir.2000), *cert. denied*, 532 U.S. 942, 121 S.Ct. 1403, 149 L.Ed.2d 346 (2001); *Consol.*

*Coal Co. v. United States,* 86 Fed.Cl. 384, 387 (2009), *aff'd,* 615 F.3d 1378 (Fed.Cir.2010); *St. Christopher Assocs., L.P. v. United States,* 75 Fed.Cl. 1, 8 (2006), *aff'd,* 511 F.3d 1376 (Fed.Cir.2008). "[S]imply because both parties moved for summary judgment, it does not follow that summary judgment should be granted one or the other." *Lew-Ron Television, Inc. v. D.H. Overmyer Leasing Co.,* 401 F.2d 689, 692 (4th Cir.1968), *cert. denied,* 393 U.S. 1083, 89 S.Ct. 866, 21 L.Ed.2d 776 (1969); *see also B.F. Goodrich Co. v. U.S. Filter Corp.,* 245 F.3d 587, 593 (6th Cir.2001); *Massey v. Del Labs., Inc.,* 118 F.3d 1568, 1573 (Fed.Cir.1997).

■ Cross-motions are no more than a claim by each party that it alone is entitled to summary judgment. The making of such inherently contradictory claims, however, does not establish that if one is rejected the other necessarily is justified. *B.F. Goodrich Co. v. United States Filter Corp.,* 245 F.3d at 593; *Atl. Richfield Co. v. Farm Credit Bank of Wichita,* 226 F.3d 1138, 1148 (10th Cir. 2000); *Allstate Ins. Co. v. Occidental Int'l, Inc.,* 140 F.3d 1, 2 (1st Cir.1998); *Reading & Bates Corp. v. United States,* 40 Fed.Cl. 737, 748 (1998). The court must evaluate each party's motion on its own merits, taking care to draw all reasonable inferences against the party whose motion is under consideration or otherwise stated in favor of the non-moving party. *DeMarini Sports, Inc. v. Worth, Inc.,* 239 F.3d 1314, 1322 (Fed.Cir.2001); *see also Gart v. Logitech, Inc.,* 254 F.3d 1334, 1338–39 (Fed.Cir.), *reh'g and reh'g en banc denied* (Fed.Cir. 2001), *cert. denied,* 534 U.S. 1114, 122 S.Ct. 921, 151 L.Ed.2d 886 (2002); *Telenor Satellite Servs., Inc. v. United States,* 71 Fed.Cl. 114, 119 (2006).

"Questions of law are particularly appropriate for summary judgment." *Oenga v. United States,* 91 Fed.Cl. 629, 634 (2010) (citing *Dana Corp. v. United States,* 174 F.3d 1344, 1347 (Fed.Cir.1999) ("Summary judgment was appropriate here [in *Dana Corp.*] because no material facts were disputed, many being stipulated, and the only disputed issues were issues of law. Moreover, on each issue one party or the other is entitled to judgment as a matter of law.")).

As noted above, the parties have cross-moved for summary judgment on the issue of which party is responsible for repairs to the sewerage system under the terms of the Lease. *See WDC West Carthage Assocs. v. United States,* 324 F.3d 1359, 1363 (Fed.Cir.) (A case involving interpretations of a lease for military housing in which the Federal Circuit stated, "We rely ... on the plain terms of the subject leases." (citing *Foley Co. v. United States,* 11 F.3d 1032, 1034 (Fed.Cir. 1993)), *reh'g and reh'g en banc* (Fed.Cir. 2003)); *Grand Acadian, Inc. v. United States,* 93 Fed.Cl. 637, 641 (2010) (involving interpretation of the lease of land to the federal government).

■ Contract interpretation is a question of law, which poses an appropriate question for summary judgment resolution. *See H.B. Mac, Inc. v. United States,* 153 F.3d 1338, 1345 (Fed.Cir.1998) (stating that matters of contract interpretation are questions of law); *see also Holland v. United States,* 621 F.3d 1366, 1374 (Fed.Cir.2010); *Dalton v. Cessna Aircraft Co.,* 98 F.3d 1298, 1305 (Fed.Cir.), *reh'g denied and en banc suggestion declined* (Fed.Cir. 1996); *C.W. Over & Sons, Inc. v. United States,* 54 Fed.Cl. 514, 520 (2002).

Contract interpretation starts with analysis of the language of the written agreement. *See Foley Co. v. United States,* 11 F.3d 1032, 1034 (Fed.Cir.1993). The United States Court of Appeals for the Federal Circuit stated in *Jowett, Inc. v. United States* that:

> In interpreting a contract, "[w]e begin with the plain language." "We give the words of the agreement their ordinary meaning unless the parties mutually intended and agreed to an alternative meaning." In addition, "[w]e must interpret the contract in a manner that gives meaning to all of its provisions and makes sense."

*Jowett, Inc. v. United States,* 234 F.3d 1365, 1368 (Fed.Cir.2000) (citations omitted); *McHugh v. DLT Solutions, Inc.,* 618 F.3d 1375, 1380 (Fed.Cir.2010); *Giove v. Dep't of Transp.,* 230 F.3d 1333, 1340–41 (Fed.Cir. 2000) ("In addition, we must interpret the contract in a manner that gives meaning to all of its provisions and makes sense. Further, business contracts must be construed with business sense, as they naturally would

be understood by intelligent men of affairs.") (citations omitted); *Hol–Gar Mfg. Corp. v. United States,* 169 Ct.Cl. 384, 388, 351 F.2d 972, 975 (1965) (The language of the "contract must be given that meaning that would be derived from the contract by a reasonable intelligent person acquainted with the contemporaneous circumstances."); *Enron Fed. Solutions, Inc. v. United States,* 80 Fed.Cl. 382, 393 (2008) ("[C]ontext defines a contract and the issues deriving thereof."). " ' "In contract interpretation, the plain and unambiguous meaning of a written agreement controls." The contract must be construed to effectuate its spirit and purpose giving reasonable meaning to all parts of the contract.' " *Arko Exec. Servs., Inc. v. United States,* 553 F.3d at 1379 (quoting *Hercules Inc. v. United States,* 292 F.3d 1378, 1380–81 (Fed.Cir.2002) (quoting *Craft Mach. Works, Inc. v. United States,* 926 F.2d 1110, 1113 (Fed.Cir.1991))); *see also Gardiner, Kamya & Assocs., P.C. v. Jackson,* 467 F.3d 1348, 1353 (Fed.Cir.2006) (citations omitted); *Medlin Constr. Grp., Ltd. v. Harvey,* 449 F.3d 1195, 1200 (Fed.Cir.2006) (reviewing the contract as a whole to determine the meaning of relevant provisions); *Hunt Constr. Grp., Inc. v. United States,* 281 F.3d 1369, 1372 (Fed. Cir.2002) ("We begin with the plain language when interpreting a contract.... The contract must be considered as a whole and interpreted to effectuate its spirit and purpose, giving reasonable meaning to all parts.") (citations omitted); *Gould, Inc. v. United States,* 935 F.2d 1271, 1274 (Fed.Cir. 1991) (indicating that a preferable interpretation of a contract is one that gives meaning to all parts of the contract rather than one that leaves a portion of the contract "useless, inexplicable, void, or superfluous").

■ " '[I]t has been a fundamental precept of common law that the intention of the parties to a contract control[s] its interpretation.' " *Beta Sys., Inc. v. United States,* 838 F.2d 1179, 1185 (Fed.Cir.1988) (quoting *Firestone Tire & Rubber Co. v. United States,* 444 F.2d 547, 551 (Ct.Cl.1971)); *Alvin, Ltd. v. United States Postal Service,* 816 F.2d 1562, 1565 (Fed.Cir.1987) ("In the case of contracts, the avowed purpose and primary function of the court is the ascertainment of the intent of the parties."); *see also Flexfab,*

*LLC v. United States,* 424 F.3d 1254, 1262 (Fed.Cir.2005) ("[I]ntent is determined by looking to the contract and, if necessary, other objective evidence. In the absence of clear guidance from the contract language, the requisite intent on the part of the government can be inferred from the actions of the contracting officer...."). When the terms of a contract are clear and unambiguous, there is no need to resort to extrinsic evidence for its interpretation. *See Teg–Paradigm Envtl., Inc. v. United States,* 465 F.3d 1329, 1338 (Fed.Cir.2006) ("When the contract's language is unambiguous it must be given its 'plain and ordinary' meaning and the court may not look to extrinsic evidence to interpret its provisions." (quoting *Coast Fed. Bank, FSB v. United States,* 323 F.3d 1035, 1038 (Fed.Cir.2003))); *see also Precision Pine & Timber, Inc. v. United States,* 596 F.3d 817, 824 (Fed.Cir.), *reh'g and reh'g en banc denied* (Fed.Cir.), *petition for cert. filed,* 79 U.S.L.W. 3141 (U.S. Sept. 8, 2010); *Barron Bancshares, Inc. v. United States,* 366 F.3d 1360, 1375 (Fed.Cir.2004) ("If the terms of a contract are clear and unambiguous, they must be given their plain meaning—extrinsic evidence is inadmissible to interpret them."); *Sea–Land Serv., Inc. v. United States,* 213 Ct.Cl. 555, 567, 553 F.2d 651, 658 (1977), *cert. denied,* 434 U.S. 1012, 98 S.Ct. 724, 54 L.Ed.2d 755 (1978); *see also King v. Dep't of Navy,* 130 F.3d 1031, 1033 (Fed.Cir.1997) ("If ambiguity is found, or if ambiguity has arisen during performance of the agreement, the judicial role is to implement the intent of the parties at the time the agreement was made."). However, because an ambiguous or uncertain writing sometimes can only be understood upon consideration of the surrounding circumstances, extrinsic evidence will be allowed to interpret an ambiguous clause. *See Cruz–Martinez v. Dep't of Homeland Sec.,* 410 F.3d 1366, 1371 (Fed.Cir.2005) (" '[M]eaning can almost never be plain except in a context.' " (quoting *Restatement (Second) of Contracts* § 212, cmt. b (1981))); *Barron Bancshares, Inc. v. United States,* 366 F.3d at 1375 (holding that extrinsic evidence is permissible to interpret an ambiguous contract); *Sylvania Elec. Prods., Inc. v. United States,* 198 Ct.Cl. 106, 126, 458 F.2d 994, 1005 (1972); *Common-*

*wealth Edison Co. v. United States,* 56 Fed. Cl. 652, 662 (2003).

█ There are limitations, however, on the use of extrinsic evidence. For example, extrinsic evidence can be used to interpret an agreement in a manner that gives meaning to all its provisions. *See McAbee Constr., Inc. v. United States,* 97 F.3d 1431, 1434 (Fed. Cir.), *reh'g denied and en banc suggestion declined* (Fed.Cir. 1996). But extrinsic evidence "may not be used 'to justify reading a term into an agreement that is not found there.'" *Warren v. Office of Pers. Mgmt.,* 407 F.3d 1309, 1314 (Fed.Cir.2005) (quoting *Fox v. Office of Pers. Mgmt.,* 100 F.3d 141, 145 (Fed.Cir.1996)); *see also McAbee Constr., Inc. v. United States,* 97 F.3d at 1434 ("[E]xtrinsic evidence ... should not be used to introduce an ambiguity where none exists." (quoting *Interwest Constr. v. Brown,* 29 F.3d 611, 615 (Fed.Cir.1994))). "The parol evidence rule provides a further limitation on the use of extrinsic evidence in interpreting contracts. Under the parol evidence rule, extrinsic evidence pre-dating a written agreement may not be used 'to add to or otherwise modify the terms of a written agreement in instances where the written agreement has been adopted by the parties as an expression of their final understanding.'" *Teg–Paradigm Envtl., Inc. v. United States,* 465 F.3d at 1338–39 (quoting *Barron Bancshares, Inc. v. United States,* 366 F.3d at 1375); *see also David Nassif Assocs. v. United States,* 214 Ct.Cl. 407, 423, 557 F.2d 249, 258 (1977) ("[T]he task of supplying a missing, but essential, term (for an agreement otherwise sufficiently specific to be enforceable) is the function of the court.").

█ The court, therefore, first must ascertain whether the language at issue was ambiguous. *See NVT Tech., Inc. v. United States,* 54 Fed.Cl. 330, 335 (2002) (finding that the threshold question is whether the document in question contains ambiguous language), *aff'd,* 370 F.3d 1153 (Fed.Cir. 2004). The United States Court of Appeals for the Federal Circuit has stated that, "[t]o show an ambiguity [in contract language,] it is not enough that the parties differ in their respective interpretations of a contract term." *NVT Tech., Inc. v. United States,*

370 F.3d 1153, 1159 (Fed.Cir.2004). In order to demonstrate ambiguity, the interpretations offered by both parties must fall within a "zone of reasonableness." *Id.* (quoting *Metric Constructors, Inc. v. NASA,* 169 F.3d 747, 751 (Fed.Cir.1999)); *see also Ace Constructors, Inc. v. United States,* 499 F.3d 1357, 1361 (Fed.Cir.2007) ("[I]n interpreting a solicitation, '[it] is ambiguous only if its language is susceptible to more than one reasonable interpretation.... If the provisions of the solicitation are clear and unambiguous, they must be given their plain and ordinary meaning.'" (quoting *Banknote Corp. of Am., Inc. v. United States,* 365 F.3d 1345, 1353 (Fed.Cir.2004))). The Federal Circuit has stated that "[a] 'patent ambiguity' is one that is 'obvious, gross, glaring, so that plaintiff contractor had a duty to inquire about it at the start,'" and "'a patent ambiguity does not exist where the ambiguity is neither glaring nor substantial nor patently obvious.'" *States Roofing Corp. v. Winter,* 587 F.3d 1364, 1372 (Fed.Cir.2009) (citations omitted); *see also NVT Techs., Inc. v. United States,* 370 F.3d at 1162 ("If the ambiguity is patent, it triggers a duty to inquire."). The Federal Circuit also has indicated that "a proper technique of contract interpretation is for the court to place itself in the shoes of a reasonable and prudent contractor and decide how such a contractor would act in interpreting the contract." *H.B. Mac, Inc. v. United States,* 153 F.3d at 1345.

The basic Lease, as amended, entered into by the parties on July 7, 1983, is Postal Service (PS) Form 7449 (Form dated December 1981), titled "U.S. Postal Service Lease." PS Form 7449 has preprinted clauses, and also contemplates individualizing the Lease by adding, subtracting, and modifying the preprinted clauses of PS Form 7449 to describe the particular property and to reflect site specific conditions. One of the primary paragraphs at issue in this case is paragraph 6, typewritten into the basic Lease, PS Form 7449, which cites to PS Form 7400–A (Form dated May 1980) titled "General Conditions to Form 7400." PS Form 7400 (Form dated November 1974), titled "Agreement to Lease," entered into June 10, 1982, preceded the Lease, and, among other objectives, set

the future rental amounts and attached another of the paragraphs at issue, the Maintenance Rider, Attachment "A." Paragraph 23 of the basic Lease, PS Form 7449, also incorporates the Maintenance Rider, Attachment "A," as part of the Lease. The preface to the Maintenance Rider states: "The following Maintenance Rider is incorporated in and made a part of these conditions. The provisions of this Rider supersedes [sic] and takes [sic] precedence over all other references to maintenance in the General Conditions."[2]

Paragraph 6 of the Lease, PS Form 7449, states:

[Preprinted] 6. The Lessor [Valley Realty] shall furnish to the Postal Service under the terms of this lease, as part of the rental consideration, the following:

[Added] Electrical, lighting, heating, air conditioning, ventilating and plumbing systems; water and *sewerage service (if public systems are not available )*, all as described in the General Conditions, PS Form 7400-A, septic tank and LP tank, if required, and meters for utilities.

[Added] USPS pays all metered utilities after occupancy. (emphasis added).

The basic Lease, PS Form 7449, originally contained a preprinted paragraph 11, which was stamped "**DELETED**" on the Lease signed by the parties, and was replaced by the added Maintenance Rider, Attachment "A." The Maintenance Rider describes which party has the responsibility for maintenance and repairs of various parts of the building. The responsibility to keep the premises in good repair and tenantable condition would have been placed on Valley Realty, the Lessor, under the deleted preprinted paragraph 11 in PS Form 7449. The original, preprinted, but deleted language of paragraph 11 stated:

[Stamped Deleted] 11.(a) *The Lessor [Valley Realty] shall,* except as otherwise specified herein and except for damage resulting from the act or negligence of Post-

al Service agents or employees, *maintain the demised premises, including the building and any and all equipment fixtures and appurtenances, whether severable or non-severable, furnished by the Lessor under this lease, in good repair and tenantable condition.* He shall repaint the interior (including but not limited to the walls and ceilings) at least once every 5 years (unless the 5–year period is specifically extended in writing by the Contracting Officer) and at any other time that painting may become necessary as a result of fire or other casualty. For the purpose of so maintaining said premises and property, the Lessor may at reasonable times enter and inspect the same and make any necessary repairs thereto. Additionally, the Lessor shall designate maintenance repairmen, for electrical emergencies, for plumbing emergencies, for heating, ventilating and air conditioning emergencies and other emergencies (windows, doors, locks, etc.), who may be called by the Postal Service in the event of an emergency situation involving maintenance of the leased property and/or equipment when the Lessor or his agent cannot be contacted within a reasonable time.

[Stamped Deleted] (b) If the leased premises or any part thereof become unfit for use for the purposes for which leased, the Lessor shall put the same in satisfactory condition, as determined by the Postal Service, for the use for which leased. For any period the premises, or any part thereof, are unfit for the purposes which leased, the rent shall be abated in proportion to the area unavailable to the Postal Service by reason of such condition. Unfitness for use does not include unsuitability arising from such causes as design, size, or location of the building or other portion of the leased premises.

[Stamped Deleted] (c) Whenever there is a need for maintenance or a repair which is the Lessor's obligation under subpara-

---

**2.** The record provided to the court is disorganized at best. Although PS Form 7449 and the Maintenance Rider were attached to the plaintiff's complaint, other parts of the contract were provided to the court only after repeated requests by the court to obtain them for the record. Even

after numerous submissions by the parties, the record still contains various copies of forms, clauses and attachments, some of which include differing paragraph numbers and include barely legible or even illegible text.

graph (a) of this paragraph 11, or for restoration of the premises or any part thereof to a condition suitable for the purposes for which leased, the Postal Service may give the Lessor written notice thereof, specifying a time for completion of the work which is reasonable and commensurate with the nature of the work required. A copy of any such notice shall be furnished by certified or registered mail to the Lessor's mortgagee and assignee of the monies due or to become due under this lease whose names and addresses have been furnished to the Postal Service by the Lessor. If the Lessor (or the mortgagee or assignee, on behalf of the Lessor) fails to prosecute the work with such diligence as will ensure its completion within the time specified in the written notice (or any extension thereof as may be granted at the sole discretion of the Postal Service) or fails to compete the work within said time, the Postal Service shall have the right to perform the work, by contract or otherwise, and withhold the cost thereof from payments due or to become due under this lease, or at the sole discretion of the Postal Service in the case of work required pursuant to paragraph (b), cancel the lease. The existence of the Postal Service's option to utilize the procedures prescribed in this subparagraph (c) does not relieve the Lessor of his affirmative obligation, under subparagraph (a) of this paragraph 11, to maintain the demised premise in good repair and tenantable condition, nor of his affirmative obligation under subparagraph (b) of this paragraph 11, to put the premises in satisfactory condition for the purposes for which leased, in the event that the premises, or any part thereof, become unfit for the purposes for which leased. (emphasis added).

In the Lease signed by the parties, the preprinted, deleted paragraphs 11(a), (b) and (c) in PS Form 7449 have been replaced by paragraphs in the added Maintenance Rider, Attachment "A," titled "Obligations of the Postal Service" and "Obligations of the Lessor." The Maintenance Rider shifted the responsibility for maintaining good repair and tenantable condition of the premises to the Postal Service, but left the Lessor responsible for "structural repairs," a term defined in the Maintenance Rider as limited to specific repair obligations. The operative paragraphs in the Maintenance Rider to the Lease state:

*Obligations of the Postal Service*

*The Postal Service shall keep the demised premises in good repair and tenantable condition,* except that the Postal Service will not be obligated to make any repairs which are the responsibility of the lessor as specified in Paragraph 2 of this rider. The term "demised premises" as used in this paragraph includes the improvements thereon and the appurtenances thereto, and any and all equipment and fixtures furnished or to be furnished by the lessor under this lease. The Postal Service's responsibilities as stated herein shall be fulfilled at such time and in such manner as the Postal Service considers necessary to keep the demised premises, equipment, fixtures, improvements and appurtenances in proper condition.

*Obligations of the Lessor*

*The lessor will be responsible for all structural repairs to the demised premises;* for repairs resulting from Acts of God, or acts of the public enemy; for repairs to all common or joint use areas that may be included as part of this lease agreement; for repairs resulting from defects in building construction or installation of equipment, fixtures and appurtenances furnished by the lessor; for repairs resulting from fire or other casualty or calamity, unless such damage arises from the act or the negligence of the Postal Service's agents or employees; and for any repairs in postal maintained areas made necessary by any failure of a facility element for which the lessor is responsible. *Structural repairs as used in this paragraph shall be limited to the foundation, bearing walls, floors, excluding the floor covering, column supports, and the roof system, including but not limited to roof covering, flashing, and insulating.*

When the need arises for repairs which are the lessor's responsibility, the Postal Service shall (except in emergencies) give the lessor written notice thereof, specifying a

time limit for completion of the work which is reasonable and commensurate with the nature of the work required. When the need arises for maintenance or repair or for restoration to a condition suitable for the purpose for which leased, the Postal Service shall (except in emergencies) give the lessor written notice thereof, specifying a time for completion of the work which is reasonable and commensurate with the nature of the work required. A copy shall be furnished by certified or registered mail to the Lessor's mortgagee and assignee of the monies due or to become due under this lease, whose names and addresses have been furnished to the Postal Service by the Lessor. If the Lessor (or the mortgagee or the assignee, on behalf of the Lessor) fails to prosecute the work with such diligence as will ensure its completion within the time specified in the written notice (or any extension thereof as may be granted at the sole discretion of the Postal Service) or fails to complete the work within said time, the Postal Service shall have the right to perform the work, by contract or otherwise, and withhold the cost thereof from payments due or to become due under this lease, or, at the sole discretion of the Postal Service, cancel the lease. In addition, for any period the premises, or any part thereof, are unfit for the purpose for which leased, the rent shall be abated in proportion to the area determined by the Postal Service to have been rendered *unavailable*[3] to the Postal Service by reason of such condition. (emphasis added).[4]

Therefore, by the terms of the Lease signed by the parties, including the Maintenance Rider, Attachment "A," the Postal Service is responsible to keep the facility "in good repair and tenantable condition." By the terms of the Lease, the plaintiff is responsible for specified structural repairs listed in the Maintenance Rider and, under paragraph 6 of PS Form 7449, is responsible for furnishing "sewerage service" to the Postal Service.

The Lease also assigns Valley Realty, as Lessor, the responsibilities for repairs resulting from Acts of God and acts of the public enemy, for repairs to common or joint use areas, for repairs resulting from defects in building construction and the installation of Lessor furnished equipment and fixtures, for repairs from fire or other casualties, and for repairs stemming from failures of a facility element for which Lessor is responsible. Plaintiff argues that an Act of God, or an act of the public enemy, was not involved in this case, nor was a fire or other casualty involved, that the sewer line was not broken as a result of a defect in construction or installation of the sewer line, and is not a common or joint use area. Finally, plaintiff argues that the repair was not made necessary by any failure of a facility element for which Valley Realty is responsible, such as the structural elements including the foundation, bearing walls, floors, column supports, and roof system. Defendant has not relied on these obligations listed in the Maintenance Rider, for which Valley Realty is responsible, as a basis for judgment in its motion for summary judgment. Nor does defendant suggest that Valley Realty's repair responsibility stems from the list of "Obligations of the Lessor" in the Maintenance Rider, Attachment "A."

Instead, defendant argues that: "Valley is responsible for the cost of repairing the septic system, which was necessary for restoring sewerage service to the property," since Lessor is assigned responsibility to furnish "sewerage service" by the following words typed onto the standard text of paragraph 6 of the Lease (PS Form 7449):

The Lessor shall furnish to the Postal Service under the terms of this lease, as part of the rental consideration, the following:

Electrical, lighting, heating, air conditioning, ventilating and plumbing systems; water and *sewerage service* (if public systems

---

3. Although in the copies submitted to the court the underlined word remains difficult to read, based on the context and those letters which are readable, it is assumed that the word "unavailable" occupies this place in the sentence.

4. The court has not altered the capitalization choices in the quoted Maintenance Rider, for example, in words such as "Lessor" and "lessor."

are not available),[5] all as described in the General Conditions, PS Form 7400-A, septic tank and LP tank, if required . . . . (emphasis added).

Defendant asserts that this language in paragraph 6 of the Lease, PS Form 7449, distinguishes electrical and other named "systems" from water and sewerage "service." Continuing, in defendant's words:

> The lease draws a distinction between "systems" and "services." The physical systems that Valley must provide include electrical, lighting, heating, air conditioning, ventilating, and plumbing. The services, which Valley must furnish for the lease term, are water and sewerage.

> Sewerage, as a service, is not necessarily a physical system like electrical and lighting. The lease obligates Valley to provide the service either as a set of on-site pipes and tanks, or, if available, through the public sewer. In this case, public sewer was not available, so Valley furnished the sewerage service by installing the pipes and tanks necessary to remove waste from the building. Valley's responsibility to provide sewerage service is the same, however, regardless of how it chooses to discharge the responsibility—that is, in consideration for the monthly rental payment, Valley must continuously provide the service.

> The maintenance rider does not shift the responsibility from Valley because it does not apply to services. "Service" is not defined in the lease, but it generally refers to a continuous level of effort, not a physical system that is installed. Sewerage service, therefore, is not with reference to a physical system, but to the level of effort necessary for Valley to provide a means of removing waste from the building, whether though [sic] the local municipal sewer or other means.

> The maintenance rider does not shift the responsibility for providing sewerage service to the Postal Service. The section entitled "Obligations of the Postal Service" applies only to the physical features of the property, including: "the improvements

thereon and the appurtenances thereto, and any and all equipment and fixtures furnished or to be furnished by the lessor under this lease." The maintenance rider places no responsibility on the Postal Service for continued furnishing of a service, such as sewerage service. (citations omitted).

Defendant's argument, therefore, is based on plaintiff's responsibility to furnish "sewerage service," which service would have been interrupted absent the repairs made by the Postal Service's contractor, PCI. Defendant maintains that the responsibility to provide water and sewerage service includes associated repairs to facilitate the provision of water and sewerage service. Defendant's interpretation of the Lease is that, although repair responsibilities for the sewerage system are not explicitly identified in the Lease as part of the Lessor's responsibilities, nevertheless, the necessity for the Lessor to repair arises from Valley Realty's responsibility to furnish water and sewerage service to the Postal Service.

Plaintiff relies on the language of the Maintenance Rider, Attachment "A" to the Lease, which states that the Postal Service shall perform repairs, save for those repairs specifically assigned to Valley Realty in paragraph 2 of the Maintenance Rider, Attachment "A," titled "Obligations of the Lessor." The Maintenance Rider assigns responsibilities for "structural repairs" to the Lessor, Valley Realty. By the terms of the Maintenance Rider, "structural repairs" are specifically defined as "limited to" repairs to the "foundation, bearing walls, floors, excluding the floor covering, column supports, and the roof system, including but not limited to roof covering, flashing, and insulating." According to plaintiff, repair of a broken sewer line is not included in the enumerated list of "structural repairs" for which the Lessor is responsible under the Lease, including the Maintenance Rider, Attachment "A." Therefore, plaintiff argues, the sewerage system repair was the responsibility of the Postal Service, and the rent to cover the repairs

---

**5.** Paragraph 25 of the Lease states that: "If public sewerage system becomes available, the undersigned agrees to pay all fees and costs for connection and the Postal Service will pay the metered recurring utility use charges."

was improperly withheld by the Postal Service and should be reimbursed, with interest.

Plaintiff states:

The Defendant's interpretation of the Lease that the Plaintiff is responsible for the repair to the septic system would be directly contrary to the plain language of the maintenance rider thus causing a conflict in the entirety of the Lease. The Defendant is attempting to use a tortured reading of the language of Paragraph 6 of the Lease to support its position that the Plaintiff is responsible for the sewer line repair.

. . .

Paragraph 6 of the Lease was intended to list the systems and services that were to be provided at the outset of the Lease. This understanding was communicated by the Plaintiff to the Defendant on February 6, 2009. This can be inferred from the last sentence in Paragraph 6 which states "USPS pays all metered utilities after occupancy" as well as the language of the Maintenance Rider itself. The Defendant's argument is that because the Plaintiff is to provide septic "service" rather than a "system" the Plaintiff is therefore responsible for this repair and ostensibly any repairs at all to the sewerage service." However, the Defendant's interpretation of the foregiong [sic] language would result in a conflict with the Maintenance Rider which clearly lists the only areas of responsibility for maintenance by the Plaintiff. (internal citations omitted).

The basic Lease, PS Form 7449, paragraph 2 states: "The Lessor hereby leases to the Postal Service the following *described premises* ... approximately 19,610 square feet of land together with all improvements thereon ...." (emphasis added). This is broad language, encompassing the whole of the property, plus additions. The Maintenance Rider, Attachment "A" uses the term, "demised" [6] rather than "described," and states, "the Postal Service shall keep the *demised premises* in good repair and tenant-

able condition." (emphasis added). In the Maintenance Rider, "demised premises" are defined as including "the improvements thereon and the appurtenances thereto, and any and all equipment and fixtures furnished or to be furnished by the Lessor under this Lease. The Postal Service's responsibilities as stated herein shall be fulfilled at such time and in such manner as the Postal Service considers necessary to keep the demised premises, equipment, fixtures, improvements and appurtenances in proper condition." This, too, is broad language, encompassing the whole of the property, including additions. *Black's Law Dictionary* states that an "improvement" is defined as follows:

A valuable addition made to property (usually real estate) or an amelioration in its condition, amounting to more than mere repairs or replacement, costing labor or capital, and intended to enhance its value, beauty or utility or to adapt it for new or further purposes. Generally, buildings, but may also include any permanent structure or other development, such as a street, sidewalks, *sewers*, utilities, etc.

*Black's Law Dictionary* 682 (5th ed. 1979) (emphasis added). An "appurtenance" is defined as an appendage, something annexed, such as an "outhouse." *Id.* at 94. Whether the sewerage system is an improvement or an appurtenance, or some other addition to the property, the sewerage system is part of the "demised premises," which defendant is required to keep in "good repair and tenantable condition," pursuant to the Maintenance Rider, Attachment "A." Defendant has not denied that the sewerage system is part of the demised premises. Defendant, instead, argues that it has no repair responsibilities for the sewerage system, not because of the location of the sewerage system, but because, in its view, repair of the sewerage system is implicit in the requirement that the Lessor furnish sewerage service.

The basic Lease, PS Form 7449, paragraph 6, provides that Valley Realty will furnish "sewerage service (if public systems

---

6. "Demised" is the equivalent of "lease" or "let" and demised premises are defined as "[t]hat property or portion of a property which is leased." *Black's Law Dictionary* 388 (5th ed. 1979). In the context of the Lease at issue, the phrase "demised premises" therefore, is synonymous with the phrase "described premises."

are not available). . . ." The words "service" and "systems" are used in the same sentence. Elsewhere in the Lease, in paragraph 25 of PS Form 7449, the phrase "public sewerage system" is used to indicate that Valley Realty will pay for connection to the public system, "[i]f public sewerage system becomes available," and the Postal Service then will pay for the metered usage costs. Sewerage service and sewerage system, therefore, appear to be used interchangeably in the basic Lease, PS Form 7449. Although the Lease explicitly addresses which party will pay for sewerage system connection if a public sewerage system becomes available, and which party will pay for metered usage, it does not explicitly address which party will make repairs to the existing sewerage system. The sewerage system is part of the "demised premises," for which the Maintenance Rider, Attachment "A" indicates the Postal Service has responsibility to "keep . . . in good repair and tenantable condition." Neither the sewerage system, nor repairs to the systems associated with the furnishing of sewerage service, is included in the list of "limited" categories of repairs for which plaintiff is made responsible in paragraph 2 of the Maintenance Rider, Attachment "A," "Obligations of the Lessor." The Maintenance Rider explicitly states that the repair responsibilities of the Lessor are limited to those listed in the Maintenance Rider.

■ After reviewing the parties' respective submissions and arguments, the court concludes that both parties have offered reasonable and plausible interpretations of the Lease. With respect to repairs, plaintiff argues that it is only responsible for the enumerated repairs listed in the Maintenance Rider, Attachment "A," which overrides the General Conditions, and the repair of the sewerage system is not one of the specified repairs for which plaintiff is responsible. By contrast, defendant argues that, given the language in the Lease that sewerage service will be furnished by plaintiff, if repairs are needed to keep the sewerage system functional, by implication, plaintiff must make the necessary repairs. Under the Lease as written, it is theoretically possible for the Lessor, Valley Realty, to furnish sewerage service through provision of a sewerage system, and

for the Lessee, the Postal Service, to be responsible for repairs to the sewerage system pursuant to the Maintenance Rider, Attachment "A." Also, arguably, given the Lease language, Valley Realty's responsibility to furnish sewerage service, even without explicit language as to which party has an obligation to make repairs to the sewerage system, could imply repair duties regarding the sewerage system on the part of the Lessor, Valley Realty.

■ As stated by the United States Supreme Court, "as between two reasonable and practical constructions of an ambiguous contractual provision . . . the provision should be construed less favorably to that party which selected the contractual language." *United States v. Seckinger*, 397 U.S. 203, 216, 90 S.Ct. 880, 25 L.Ed.2d 224, *reh'g denied*, 397 U.S. 1031, 90 S.Ct. 1255, 25 L.Ed.2d 546 (1970). This doctrine of *contra proferentem* " 'pushes the drafters toward improving contractual forms[,] and it saves contractors from hidden traps not of their own making.' " *Fry Commc'ns, Inc. v. United States*, 22 Cl.Ct. 497, 503 (1991) (quoting *Sturm v. United States*, 190 Ct.Cl. 691, 697, 421 F.2d 723, 727 (1970)) (alteration in *Fry Commc'ns, Inc. v. United States*).

The United States Court of Appeals for the Federal Circuit has similarly stated:

> When a dispute arises as to the interpretation of a contract and the contractor's interpretation is reasonable, we apply the rule of *contra proferentem*, which requires that ambiguous or unclear terms that are subject to more than one reasonable interpretation be construed against the party who drafted the document.

*Turner Constr. Co. v. United States*, 367 F.3d 1319, 1321 (Fed.Cir.2004) (citing *United States v. Turner Constr. Co.*, 819 F.2d 283, 286 (Fed.Cir.1987)); *see also Gardiner, Kamya & Assocs. v. Jackson*, 467 F.3d at 1352; *HPI/GSA–3C, LLC v. Perry*, 364 F.3d 1327, 1334 (Fed.Cir.2004).

In order to decide how to apply the doctrine of *contra proferentem*, after a court finds contract terms to be ambiguous and "susceptible to more than one reasonable interpretation," the court must first deter-

mine whether the ambiguity is latent or patent. *E.L. Hamm & Assocs., Inc. v. England,* 379 F.3d 1334, 1341, 1342 (Fed.Cir.2004) ("If an ambiguity exists, the next question is whether that ambiguity is patent."). In *States Roofing,* the Federal Circuit stated:

> A "patent ambiguity" is one that is "obvious, gross, glaring, so that plaintiff contractor had a duty to inquire about it at the start." *H & M Moving, Inc. v. United States,* 204 Ct.Cl. 696, 499 F.2d 660, 671 (1974). As explained in *Grumman Data Systems Corp. v. Dalton,* "a patent ambiguity does not exist where the ambiguity is neither glaring nor substantial nor patently obvious." 88 F.3d 990, 997 (Fed.Cir. 1996) (internal quotation marks omitted). *See generally WPC Enters.* [*Inc. v. United States*], [163 Ct.Cl. 1,] 323 F.2d [874,] 877 [ (1963) ] ("Although the potential contractor may have some duty to inquire about a major patent discrepancy, or obvious omission, or a drastic conflict in provisions, he is not normally required (absent a clear warning in the contract) to seek clarification of any and all ambiguities, doubts, or possible differences in interpretation.").

. . .

■ As precedent explains, there must be a glaring conflict or obvious error in order to impose the consequences of misunderstanding on the contractor. *See HPI/GSA–3C, LLC v. Perry,* 364 F.3d 1327, 1334 (Fed.Cir.2004) ("Where an ambiguity is not sufficiently glaring to trigger the patent ambiguity exception, it is deemed latent and the general rule of *contra proferentum* applies."); *Blount Bros. Constr. Co. v. United States,* 171 Ct.Cl. 478, 346 F.2d 962, 973 (1965) ("[Contractors] are not expected to exercise clairvoyance in spotting hidden ambiguities in the bid documents, and they are protected if they innocently construe in their own favor an ambiguity equally susceptible to another construction, for ... the basic precept is that ambiguities in contracts drawn by the Government are construed against the drafter.").

*States Roofing Corp. v. Winter,* 587 F.3d at 1372 (brackets and omissions in original); *LAI Servs., Inc. v. Gates,* 573 F.3d 1306,

1315–16 (Fed.Cir.), *reh'g denied* (Fed.Cir. 2009); *Metric Constructors, Inc. v. NASA,* 169 F.3d at 751. "A patent ambiguity is one that is 'obvious, gross, [or] glaring, so that plaintiff contractor had a duty to inquire about it at the start.'" *NVT Tech., Inc. v. United States,* 370 F.3d 1153, 1162 (Fed.Cir. 2004) (quoting *H & M Moving, Inc. v. United States,* 204 Ct.Cl. 696, 499 F.2d 660, 671 (1974)). "If an ambiguity is obvious [patent] and a bidder fails to inquire with regard to the provision, his interpretation will fail." *NVT Tech., Inc. v. United States,* 370 F.3d at 1162 (citing *Triax Pac., Inc. v. West,* 130 F.3d 1469, 1475 (Fed.Cir.1997)). "A contractor may not recover for a patent ambiguity." *E.L. Hamm & Assocs., Inc. v. England,* 379 F.3d at 1342. "The doctrine of patent ambiguity is an exception to the general rule of *contra proferentem,* which the courts use to construe ambiguities against the drafter." *Id.* (citing *Metric Constructors, Inc. v. NASA,* 169 F.3d at 751) (emphasis in original).

■ If, on the other hand, the ambiguity is latent or not obvious, the general rule of *contra proferentem* controls. *See HPI/GSA–3C, LLC v. Perry,* 364 F.3d at 1334. The doctrine of *contra proferentum* places the risk of latent ambiguity, lack of clarity, or absence of proper warning on the drafting party. However, it is "a 'rule of last resort' that 'is applied only where there is a genuine ambiguity and where, after examining the entire contract, the relation of the parties and the circumstances under which they executed the contract, the ambiguity remains unresolved.'" *Gardiner, Kamya & Assocs. v. Jackson,* 467 F.3d at 1352 (quoting *Lewis v. United States,* No. 34–78, 30 Cont. Cas.Fed. (CCH) P 70352, 1982 WL 36718, at *7 (Ct.Cl. Trial Div. July 16, 1982) (decision adopted as the judgment of the United States Court of Claims, at 231 Ct.Cl. 799, 800 (1982))).

■ The original Lease term began June 1, 1983, over 27 years ago, using a form Lease, PS Form 7449, dated two years earlier, in December 1981. Over the term of the Lease, including the five year extensions, neither the record, nor counsel, indicate that the issue at the crux of this case, to inter-

pret the form Lease and typed in provisions in paragraph 6 of PS Form 7449 and the typed in Maintenance Rider, Attachment "A," regarding sewerage system, repair responsibilities, has arisen previously, which is consistent with the court's conclusion that the ambiguity in the Postal Service forms and Maintenance Rider, Attachment "A" is not glaring and obvious, but latent. Given the two reasonable and plausible interpretations of the words of the Lease and Maintenance Rider, Attachment "A," the court finds latent ambiguity in the competing contract language, and that there are two competing, reasonable, plausible interpretations of the Lease documents, as to which party is responsible for repair of the sewerage system.

Plaintiff argues that under the rule of *contra proferentum*, its interpretation of the Lease should control. The parties have stipulated, and the record reflects, that the signatories to the Lease were Philip Roark for the Lessor, Valley Realty and Charles E. Smith, the Postal Service Manager, Real Estate Branch, for the Lessee, the Postal Service. As to which party drafted the Lease, or whether the Lease or selected provisions of the Lease were a product of negotiation, the parties have stipulated that the standard Lease forms and the Maintenance Rider, Attachment "A" were typed by the Postal Service. Plaintiff submitted an affidavit from Philip Roark, who signed the original Agreement to Lease, PS Form 7400, for the plaintiff on June 10, 1982 and the original Lease, PS Form 7449, for the plaintiff on July 7, 1983. In his affidavit, Mr. Roark recalled that he responded to a bid solicitation from the Postal Service, and was awarded a contract to build and lease the post office facility in Birchwood, Tennessee. Mr. Roark further stated that the only negotiations with the Postal Service were over "the amount of the rents to be paid for the base term of the lease and for the renewal options," that no other terms of the Lease were negotiated, and that "the U.S. Postal Service created and drafted the entire lease." The parties have stipulated that the only evidence as to which party drafted the Lease, and whether the pertinent clauses were the product of negotiation, is contained in Mr. Roark's affidavit. Mr. Roark's recollections were unchallenged. His counterpart with the Postal Service, Mr. Smith, is no longer an employee of the Postal Service, and is believed to be deceased. Defendant declines to agree to what extent the Lease was a product of negotiation.

The court directed the parties to file supplemental briefs on the question of which party drafted the Lease, and to address the application of the rule of *contra proferentum*. Defendant, however, failed to address the merits of applying *contra proferentum* to this case and merely stated that *contra proferentum* did not apply. Instead, defendant argued that the new evidence,[7] belatedly identified by the defendant, unambiguously demonstrates that Valley Realty was responsible to provide sewerage service throughout the lease period, and again urged that the obligation to provide sewerage service implies that Valley Realty also must make any necessary repairs to provide continued sewerage service.

The new evidence argument defendant brought to the court's attention late in the case is subparagraph 4(i) of PS Form 7400–A, concerning sewerage service. Initially, PS Form 7400 and PS Form 7400–A, "General Conditions to Form 7400," were not included in the record until the court directed defendant to file a complete and readable copy of the Lease, including Postal Service

7. The new evidence, which defendant argues resolves the case is a more complete copy of the Lease between the parties, discovered somehow by the defendant only after the court ordered the parties on October 19, 2010 to produce a complete and legible Lease and to address the *contra proferentum* issue. In an Order on October 26, 2010, the court noted defendant's failure to address the *contra proferentum* issue, and on December 9, 2010, the court ordered the parties to stipulate to the unreadable terms in the copies of the Lease provided. Prior to December 10, 2010, neither party had provided the court with a complete copy of the Lease, including all relevant Postal Service Forms, or the terms and conditions which were incorporated by reference into the Lease, despite an exchange of briefing. Various copies of the Lease previously provided to the court were totally missing pages, or missing incorporated forms, other portions of the Lease were missing parts of a page, and other pages, as noted above, contained words which were not readable or were barely legible.

Form 7400–A, the document defendant now claims is the critical document. In the last paragraph of PS Form 7449, immediately above the signatures, the Lease incorporates, by reference, the "terms and conditions of the Agreement to Lease ... including any amendments of [sic] modifications thereto...." Paragraph 6 of the basic Lease between the parties, typed into PS Form 7449, also indicates that "[t]he Lessor shall furnish to the Postal Service ... plumbing systems; water and sewerage service (if public systems are not available), all as described in the General Conditions, PS Form 7400–A...." Defendant now argues that PS Form 7400–A, paragraph 4, titled "Lessor Obligations," subparagraph 4(i), supports the Postal Service's position that Valley Realty is unambiguously responsible for the repairs to the sewerage system.

Subparagraph 4(i) of PS Form 7400–A states: "If sewerage service is furnished—Lessor agrees to furnish and pay for sewerage service during continuance of the lease." Defendant interprets this language to mean that Valley Realty must furnish sewerage service continuously, throughout the Lease and, in defendant's words, "[a]ccordingly, when the toilets back up and sewerage service is no longer available, Valley must restore service as long as the lease is continuing." Paragraph 4 of PS Form 7400–A is titled "Lessor Obligations." In addition to the subparagraph 4(i) on which defendant now relies, another subparagraph, 4(h), of PS Form 7400–A, titled "Maintenance," addressed repair responsibilities, but is stamped "**DELETED**." Subparagraph 4(h) was the only subparagraph of paragraph 4 which was deleted and replaced by the parties. Deleted subparagraph 4(h) was replaced in substance by the Maintenance Rider, Attachment "A" to the Lease. Paragraph 1 of Maintenance Rider titled "Obligations of the Postal Service," begins, "[t]he Postal Service shall keep the demised premises in good repair and tenantable condition...."

The remaining subparagraphs of paragraph 4, of PS Form 7400–A, which were not deleted, include language whereby the Lessor was to furnish various systems, equipment and services to the Lessee. Notably, these remaining subparagraphs in the General Conditions, PS Form 7400–A, 4(a), 4(b), 4(c), 4(d), 4(e), 4(f), 4(g), 4(i), 4(j), and 4(k), do not contain the word "repair," and do not allocate repair responsibilities, the exclusive purpose of repair subparagraph 4(h), and now the purpose of its replacement, the Maintenance Rider, Attachment "A." Each of these subparagraphs to paragraph 4, PS Form 7400–A, addresses Lessor's responsibility for systems, equipment or services. Subparagraph 4(a), for example, begins, "[i]f fuel is furnished [by the Lessor]," then lists the Lessor's responsibilities, but does not list repair responsibilities. The same is true for the other systems, equipment or services identified in paragraph 4, each of which defines Valley Realty's responsibilities, but does not mention repair responsibilities: subparagraph 4(b), "[i]f heat is furnished," subparagraph 4(c), "[i]f neither fuel nor heat is furnished," subparagraph 4(d), "[i]f light is furnished," subparagraph 4(e), "[i]f light is not furnished and fluorescent lights are used," subparagraph 4(f), "[i]f power is furnished," subparagraph 4(g), "[i]f water is furnished," paragraph 4(j), "[i]f air conditioning equipment is furnished," and paragraph 4(k), "[i]f air conditioning is furnished." In sum, none of these other subparagraphs in paragraph 4, PS Form 7400–A, were deleted, and none of these subparagraphs, including 4(i), ("[i]f sewerage service is furnished"), contained the word "repair," save for the deleted subparagraph 4(h), which actually addressed maintenance and repair, as does its successor, the Maintenance Rider.

Reading paragraph 4 "Lessor Obligations" of the General Conditions in PS Form 7400–A as a whole, repairs to all the systems, equipment and services furnished in the paragraph (fuel, heat, heating system, light, light fixtures, power, water, sewerage, air conditioning equipment, and air conditioning), were addressed in deleted subparagraph 4(h), and now are replaced in the Lease by the Maintenance Rider, Attachment "A." Far from supporting defendant's position, a review of paragraph 4 in PS Form 7400–A, "General Conditions to Form 7400," arguably provides support for plaintiff's position, that repair responsibilities were addressed in the successor to subparagraph

**34**

4(h) of PS Form 7400–A, in the Maintenance Rider, Attachment "A," which assigns repair responsibilities to the Postal Service, except those specifically retained to Valley Realty. The preamble to the Maintenance Rider made part of the Lease states clearly: "The following Maintenance Rider is incorporated in and made a part of these conditions. The provisions of this Rider supersedes [sic] and takes [sic] precedence over all other references to maintenance in the General Conditions."

That the Lease was drafted by the Postal Service, save for negotiations by the parties on the rent to be paid, is supported not only by Mr. Roark's uncontroverted affidavit, but also by the fact that the Lease is comprised of standard Postal Service Form 7449 (Dec. 1981), with extensive pre-printed clauses, Postal Service Form 7400 (Nov. 1974), "Agreement to Lease," and Postal Service Form 7400–A (May 1980), "General Conditions to Form 7400," each also with extensive pre-printed, standard clauses. Finally, all these Postal Service Forms are in the record. Based on the evidence in the record, the court finds that the Lease was drafted by the Postal Service, and that any latent ambiguities in the language of the Lease, therefore, will be construed against the Postal Service. Under the rule of *contra proferentum*, the court adopts plaintiff's reasonable and plausible interpretation of the Lease, that repair of the sewerage system is assigned to the Postal Service under the Maintenance Rider, Attachment "A" to the Lease.

The parties have stipulated, and the court finds, that the repairs to the sewerage system were necessary. The Maintenance Rider, Attachment "A" to the Lease addresses the responsibility for repairs in the Lease signed by the parties. By its terms, the Maintenance Rider "takes precedence over all other references to maintenance in the General Conditions" of the Lease. Accordingly, the Postal Service is responsible for repairs to the premises, save for the enumerated, limited, repair obligations listed in the Maintenance Rider, for which Valley Realty has responsibility. Moreover, the reference in paragraph 6 of the basic Lease, PS Form 7449, to "water and sewerage service" does not contain any reference to maintenance. Based on the above determined facts and analysis, the Postal Service, Lessee, improperly withheld $5,388.67 from the Lessor, Valley Realty.

### CONCLUSION

For the foregoing reasons, defendant's cross-motion for summary judgment is **DENIED.** Plaintiff's cross-motion for summary judgment is **GRANTED.** Plaintiff is awarded $5,388.67, withheld from rent due plaintiff between April 1, 2010 and September 1, 2010, plus appropriate interest. The Clerk's Office shall enter judgment for plaintiff consistent with this opinion.

**IT IS SO ORDERED.**