# United States Court of Appeals for the Federal Circuit

05-1524

GARDINER, KAMYA & ASSOCIATES, P.C.,

Appellant,

v.

Alphonso Jackson,
SECRETARY OF HOUSING AND URBAN DEVELOPMENT,

Appellee.

Philip M. Musolino, Musolino & Dessel, of Washington, DC, argued for appellant.

Sean McNamara, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice of Washington, DC, argued for appellee. On the brief were Peter D. Keisler, Assistant Attorney General; David M. Cohen, Director; Mark A. Melnick, Assistant Director; and David A. Harrington, Trial Attorney. Of counsel were Cristina C. Ashworth and Kenneth M. Dintzer, Attorneys.

Appealed from: United States Board of Contract Appeals Department of Housing and Urban Development

Administrative Judge H. Chuck Kullberg

# United States Court of Appeals for the Federal Circuit

05-1524

GARDINER, KAMYA & ASSOCIATES, P.C.,

Appellant,

v.

Alphonso Jackson,
SECRETARY OF HOUSING AND URBAN DEVELOPMENT,

Appellee.

_____

DECIDED: November 8, 2006
_____

Before LOURIE, DYK, and PROST, <u>Circuit Judges</u>.

DYK, <u>Circuit Judge</u>.

Gardiner, Kamya & Associates, P.C. ("GKA") appeals from a decision of the Board of Contract Appeals ("BCA") of the U.S. Department of Housing and Urban Development ("HUD"), denying GKA's claim for a retroactive pricing adjustment in its contract with HUD. We affirm.

## BACKGROUND

On May 14, 1993, GKA and HUD entered into indefinite delivery/indefinite quantity contract No. DU100C000018170, under whose terms HUD agreed to purchase between $2,000,000 and $28,000,000 of various accounting services for the purpose of "ensur[ing] the integrity of [HUD's] Single Family Mortgage Insurance Program and []

protect[ing] the insurance fund." Under the program, HUD guaranteed certain single-family mortgages. In the event that the mortgagor defaulted, the mortgagee could file a claim with HUD for payment of the outstanding balance of the mortgage. HUD did not conduct in-depth reviews of claims as they were filed, and for this reason HUD hired GKA to further review selected claims, ensure that the mortgagees complied with all applicable regulations, follow-up with mortgagees concerning any irregularities, provide technical support to mortgagees and HUD and suggest improvements to HUD's processes.

The indefinite delivery/indefinite quantity contract adopted Federal Acquisition Regulations governing such contracts. See 48 C.F.R. §§ 52.216-18 to 52.216-22. As contemplated by the regulations the contract did not provide for any specific work to be done. Rather, the specific tasks to be performed, pricing and other arrangements were to be negotiated separately for each task order. The regulations further state that the contractor is bound to perform all work called for in the task orders. 48 C.F.R. § 52.216-22 ("The Contractor shall furnish to the Government, when and if ordered, the supplies or services specified.").

In March 1996 the parties executed task orders 13 and 14. Under task order 13, GKA agreed to provide post-claims reviews to ensure that mortgagees did not overbill HUD and otherwise complied with HUD requirements. The task order provided for a "fixed unit price" arrangement and required GKA to invoice claims as they were actually processed. Claims were divided into categories and assigned unit prices per claim reviewed for each category. The task order stated that "the contractor shall perform" reviews of 374 claims, which were individually listed and categorized at the end of the

task order. The task order calculated the price for review of all listed claims to be $2,186,269 and accordingly allocated a total task order amount "not to exceed (NTE) $2,186,269." GKA was not entitled automatically to any of these funds; rather, GKA was to be paid as it invoiced specific claims after reviewing them. Task order 13 provided for a fifteen month "period of performance" for GKA to perform the reviews, measured from the task order's effective date of March 11, 1996. Task order 14 was similar to task order 13 in its pricing structure and fifteen-month "period of performance." It required GKA to perform follow-up reviews of the post-claims reviews. Follow-up reviews involved reviewing mortgagees' responses to GKA's requests for more information or documentation, made during the post-claim reviews. Like task order 13, task order 14 categorized claims and provided a fixed price per review of each category. A task order amount "not to exceed (NTE) $390,353" was allocated for task order 14, but as with task order 13, GKA had to invoice claims as they were reviewed to be paid.

The fixed unit prices per claim listed in the task orders were calculated by estimating the number of hours of work required, multiplying them by an hourly rate for particular types of employees doing the work, and adding the results to obtain a fixed price for each claim. HUD never independently estimated the number of hours required; rather, the estimates of number of hours required to perform claims reviews were derived from estimates used in a prior contract between HUD and another contractor, Irvin Burton & Associates. During the negotiations for task orders 13 and 14, GKA sought higher prices per review than those finally adopted in the task orders. GKA contended that the estimates, which were also used in earlier task orders, underestimated the time required and that it had to spend many more hours to perform

the claims reviews. HUD refused to change the prices. Eventually, GKA agreed to HUD's proposed prices for task orders 13 and 14.

In the spring of 1997 the end of the fifteen-month period of performance of task orders 13 and 14 was approaching, but GKA had not finished reviewing the 374 claims that those task orders originally required. The record does not disclose whether GKA had a legitimate excuse for failing to perform the required work under task orders 13 and 14 within the allotted period. But whether it did or not, HUD desired GKA to continue the work beyond the time allotted for completion. HUD decided to seek a six month "no-cost" extension to allow GKA time to finish the claim reviews at the original contract prices. Although HUD did not wish to alter the unit prices of the task orders, GKA again insisted that the fixed prices then in force did not properly reflect the number of hours that GKA worked. HUD explicitly stated its disagreement.

During these negotiations over the modification, GKA submitted invoices for past work in amounts in excess of the authorized task order prices. HUD immediately rejected the invoices and directed GKA not to bill in excess of the fixed prices established by the task orders.

The BCA found that during negotiations there was no understanding on the repricing issue. GKA president Chris Gardiner ("Gardiner") and another GKA official testified that they had a meeting in July 1997 with a HUD official, who allegedly promised that adjustments would be retroactive and cover all work, including reviews already invoiced and paid for, completed under task orders 13 and 14. The BCA found that HUD did not share this understanding, and it is undisputed that Gardiner did not advise any of the HUD contracting officers of the alleged conversation. On October 31,

05-1524                                         4

1997, Gardiner sent a letter to HUD expressing his understanding that "[a]djustments w[ould] be made to the old rates at the conclusion of this review, if necessary. GKA w[ould] then be compensated for the difference between the new and old rates, if necessary." The BCA found that this letter did not affirmatively convey GKA's alleged view that the repricing was to be retroactive.

In November 1997 the parties executed Modification 2 to task order 13 and Modification 2 to task order 14 (collectively, "Modification 2"). Modification 2 had an effective date of July 1, 1997. While the parties dispute whether that modification provided for retroactive pricing of the work already performed, they agree that it provided that GKA would continue the unfinished work under task orders 13 and 14 and that the parties would consider adjustment of the pricing for the continuing work. The modification provided in relevant part:

> The purpose of this modification is to: (1) definitize contracting officer's verbal authorization of July 1, 1997, to continue the services under the existing statement of work; and, (2) extend the performance period of this agreement by additional six (6) months.
> . . .
> 1.  The period of performance is hereby modified to read: "Twenty one (21) months from the effective date of award"
>
> 2.  The contractor shall continue performance of the services required under this task order at the same "Unit Price Per Review" specified for the respective categories on Page 3 of the task order. Such prices shall remain in effect pending results of the audit and subsequent negotiations of the unit prices.

As contemplated by Modification 2, the Defense Contract Audit Agency ("DCAA") performed an audit in late 1997. The hours that the DCAA audit found GKA actually worked were greater than the estimates used to calculate the prices of the original task orders 13 and 14. Accordingly, HUD permitted adjustment of the prices during the

extension period (after July 1, 1997).[1]  On July 15, 1998, GKA wrote to a HUD contracting officer claiming an entitlement to have task orders 13 and 14 repriced retroactively to March 1, 1996.  HUD promptly refused, in writing, to adjust prices retroactively to the 1996 date.

GKA appealed the contracting officer's denial of repricing retroactive to 1996 to the BCA on January 13, 2000.  The BCA conducted a hearing.  In its first decision, the BCA held that GKA was not entitled to a retroactive pricing adjustment because Modification 2 was unenforceable insofar as it might be construed to give a retroactive price adjustment.  The BCA held that Modification 2 lacked adequate consideration to reprice task orders 13 and 14 retroactively because GKA was already obligated to perform the work under the original task orders 13 and 14.  GKA appealed the BCA's determination to this court.  We reversed the BCA's determination that the modification lacked consideration because we found that GKA was not obligated to continue the work after the period specified in the original contract, despite the fact that it had been obligated to perform that work during the original contract period.  Gardiner, Kamya & Assoc. v. Jackson, 369 F.3d 1318, 1323 (Fed. Cir. 2004).  We remanded to the BCA to consider in the first instance whether the language of Modification 2 was ambiguous as to whether the price adjustment was to be retroactive.  Id.

---

[1]    The original six-month extension of Modification 2 was subsequently further extended to late 1998.  HUD paid adjusted prices for the entire extension period of July 1, 1997, to late 1998, but not for the pre-extension period of March 11, 1996, to July 1, 1997.

After the DCAA audit, HUD drafted Modification 5, whose stated purpose was to "definitize the negotiated price adjustments."  Modification 5 stated that "[t]he adjustment in the rates shall be retroactive beginning July 1, 1997 [(the effective date of Modification 2)]."  Gardiner refused to sign Modification 5 because it was not retroactive to March 1, 1996, the inception date of task orders 13 and 14.

On June 17, 2005, after remand and without a further hearing, the BCA issued its decision.[2] The BCA held that Modification 2 was ambiguous as to the retroactivity of the pricing adjustment. Because the ambiguity was latent rather than patent, the contractor was under no obligation to make an inquiry. However, the BCA rejected GKA's argument that Modification 2 should be construed against HUD as the drafter under the doctrine of contra proferentem because it found that the doctrine was inapplicable under this court's test in HPI/GSA-3C, LLC v. Perry, 364 F.3d 1327 (Fed. Cir. 2004) ("HPI"), since there was no evidence that GKA "actually and reasonably" construed the contract to be retroactive and because "the intent of the parties does appear elsewhere in the documentary record other than just the text of [M]odification 2." The BCA concluded that HUD's interpretation of Modification 2 was more reasonable than GKA's and therefore denied the retroactive pricing adjustment. GKA timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(10) (2000).

## DISCUSSION

We review the BCA's decision under the standard set out in the Contract Disputes Act of 1978, 41 U.S.C. §§ 601-613 (2000) ("CDA"). Under the CDA, a board's conclusions of law are reviewed without deference. 41 U.S.C. § 609(b); White v. Edsall Constr. Co., 296 F.3d 1081, 1084 (Fed. Cir. 2002). An agency board's findings of fact will not be set aside unless "fraudulent, or arbitrary, or capricious, or so grossly erroneous as to necessarily imply bad faith, or if such decision is not supported by substantial evidence." 41 U.S.C. § 609(b).

---

[2] The BCA appeared to adopt the findings of fact and conclusions of law of the first BCA decision to the extent that they survived our first decision.

The BCA's approach to construction of the contract language and to the doctrine of contra proferentem is misplaced. Ascertaining the most reasonable construction of contract language utilizing other tools of contract interpretation must be the first priority. In contrast the doctrine of contra proferentem is applied only when other approaches to contract interpretation have failed. Accordingly, our predecessor court held that "if an ambiguity cannot be cleared up by reading the contract as a whole or looking to the circumstances attending the transaction and the conduct of the parties, the ambiguity should be resolved against the party who drafted the contract." Chris Berg, Inc. v. United States, 455 F.2d 1037, 1044 (Ct. Cl. 1972). As our predecessor court held more pointedly, contra proferentem is a "rule of last resort" that "is applied only where there is a genuine ambiguity and where, after examining the entire contract, the relation of the parties and the circumstances under which they executed the contract, the ambiguity remains unresolved." Lewis v. United States, 29 C.C.F. ¶ 82,470, at *7, 1982 WL 36718, at *7 (recommended decision adopted as the judgment of the Court of Claims in 231 Ct. Cl. 799, 800 (1982)) (citing United States v. Erickson Paving Co., 465 F.2d 396, 400 (9th Cir. 1971)).[3] We recently recognized that the doctrine is inapplicable if "the intention of the parties . . . otherwise appear[s]." HPI, 364 F.3d at 1334.

The overwhelming weight of authority in other jurisdictions also recognizes that contra proferentem is a rule of last resort. See, e.g., Residential Mktg. Group v. Granite

---

[3]     To the extent that earlier Court of Claims cases might be read to suggest a different approach, see, e.g., Tulelake Irrigation Dist. v. United States, 342 F.2d 447, 453 (Ct. Cl. 1965), we must follow the later en banc decision in Berg. See Doe v. United States, 372 F.3d 1347, 1355 (Fed. Cir. 2004).

Inv. Group, 933 F.2d 546, 549 (7th Cir. 1991); Record Club of Am. v. United Artists Records, 890 F.2d 1264, 1271 (2d Cir. 1989); see also; 5 Margaret N. Kniffin, Corbin on Contracts § 24.27 at 297 (Joseph M. Perillo ed., rev. ed. 1993) (describing contra proferentem as "a tie breaker when there is no other sound basis for choosing one contract interpretation over another") (internal quotations omitted); 2 E. Allan Farnsworth, Farnsworth on Contracts § 7.11 at 304 (3d ed. 2004) (contra proferentem "is often denigrated as a rule of last resort") (internal quotations omitted); id. n.33 (citing cases); Restatement (Second) of Contracts, § 206, cmt. a (1981).

Thus, before turning to the doctrine of contra proferentem, we must determine whether the language of the contract itself answers the question of retroactivity. GKA argues that the language of Modification 2 is ambiguous as to whether the repricing was to be retroactive or prospective only. Construction of the language of the contract to determine whether there is an ambiguity is a question of law which we review without deference. HPI, 364 F.3d at 1333.[4] We hold that the language is not ambiguous.

In construing the contract to determine whether it is ambiguous, we keep in mind this court's well-settled principles of contract interpretation. We begin with the plain language of the contract. C. Sanchez and Son, Inc. v. United States, 6 F.3d 1539, 1543 (Fed. Cir. 1993) ("A contract is read in accordance with its express terms and the plain meaning thereof."). "We must interpret [a contract] as a whole and 'in a manner which gives reasonable meaning to all its parts and avoids conflict or surplusage of its provisions.'" United Int'l Investigative Serv. v. United States, 109 F.3d 734, 737 (Fed.

---

[4] Since the issue of ambiguity is a legal question, it is irrelevant that various parties to the negotiations in hindsight might have concluded that the language was ambiguous.

Cir. 1997) (citing <u>Granite Constr. Co. v. United States</u>, 962 F.2d 998, 1003 (Fed. Cir. 1992)); <u>see also</u> <u>Dalton v. Cessna Aircraft Co.</u>, 98 F.3d 1298, 1305 (Fed. Cir. 1996) (describing as a "settled principle[] of contract interpretation" that courts "view[] the contract as a whole"); <u>McAbee Constr., Inc. v. United States</u>, 97 F.3d 1431, 1435 (Fed. Cir. 1996); 11 Richard A. Lord, Williston on Contracts § 32:5 at 420 (4th ed. 1999).

Here it is clear that Modification 2, when viewed as a whole, is not ambiguous. Its language establishes that the modification is directed toward extending the period of performance and repricing the continuing work, not repricing the work already performed. The Modification's stated purpose is "to <u>continue</u> the services under the existing statement of work" and to "<u>extend</u> the performance period." (emphasis added) The choice of words "continue" and "extend" implies that the modification is forward-looking, not retroactive. The modification's statement of purpose says nothing about repricing work already performed for which the contractor had already been paid. The body of the agreement is equally clear. The second paragraph obligates the contractor to "continue performance of the services required under [task orders 13 and 14] at the same 'Unit Price Per Review' specified for the respective categories [in the task orders]." In other words it provides that the work shall continue at the original prices. Immediately thereafter, it provides that "[s]uch prices shall remain in effect pending results of the audit and subsequent negotiations of the unit prices." The reference to "such prices" is plainly to the prices for the continued work, not to the prices for the work already performed. The phrase "[s]uch prices shall remain in effect pending results of the audit and subsequent negotiations of the unit prices" does not in any way state or suggest a retroactive pricing arrangement, and we may not "convert an agreement's

utter silence on an issue into contractual ambiguity." New Jersey v. New York, 523 U.S. 767, 783 n.6 (1998). Finally, the modification has an effective date of July 1, 1997—another indication that it was not intended to be retroactive. Accordingly, we hold that the language of Modification 2 is clear on its face; that there is consequently no ambiguity; and that the modification did not provide for retroactive pricing. See Edward R. Marden. Corp. v. United States, 803 F.2d 701, 705 (Fed. Cir. 1986).

Even if there were an ambiguity in the contract, the negotiating history of the contract shows that it was not intended to be retroactive. When a contract is ambiguous, before resorting to the doctrine of contra proferentem, "we may appropriately look to extrinsic evidence to aid in our interpretation of the contract." Metro. Area Transit, Inc. v. Nicholson, 463 F.3d 1256, 1260 (Fed. Cir. 2006); see also City of Tacoma, Dep't of Pub. Utils. v. United States, 31 F.3d 1130, 1134 (Fed. Cir. 1994); Banknote Corp. of Am. v. United States, 365 F.3d 1345, 1353 (Fed. Cir. 2004); U.C.C. § 2-208 (2003). We see no error in the BCA's findings that Gardiner's testimony regarding various meetings with HUD officials does not establish that the parties agreed to make Modification 2 retroactive, and that Gardiner's letter does not reveal any communications to that effect. The parties had previously had a dispute regarding the prices for task orders 13 and 14 during the original negotiations for those task orders in 1996, and GKA had reluctantly agreed to the government's prices. During the period of performance of those task orders before Modification 2, GKA urged repeatedly that the prices should be modified.[5] There was another dispute on this very issue during

---

[5] GKA states in its brief that "Gardiner met with [HUD] about 20 times over [a] fifteen month period" regarding the repricing issue.

negotiations over the extension.[6]  Against this background, it seems inconceivable that the parties would have agreed to retroactive pricing without making that intent explicit either during the negotiations leading to the agreement or in the agreement itself.  Since they did neither, we conclude that even if there were an ambiguity in the language, it should be resolved in favor of the government's position.

## CONCLUSION

For the foregoing reasons, the decision below is affirmed.

## AFFIRMED

## COSTS

No costs.

---

[6]     GKA states that "from May 1997 through October 1997, GKA sought to obtain from HUD retroactive pricing."