ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of - | ) |
| | ) |
| Jemison & Partners, Inc. | ) ASBCA No. 62928 |
| | ) |
| Under Contract No. W912P8-19-C-0018 | ) |

APPEARANCE FOR THE APPELLANT:    W. Lee Kohler, Esq.
        Kohler Construction Law, APLC
        Metairie, LA

APPEARANCES FOR THE GOVERNMENT:  Michael P. Goodman, Esq.
        Engineer Chief Trial Attorney
        William G. Meiners, Esq.
        Engineer Trial Attorney
        U.S. Army Engineer District, New Orleans

OPINION BY ADMINISTRATIVE JUDGE O'CONNELL

This is a dispute about topsoil, or, more specifically, a dispute about whether appellant would be paid for the actual quantities of soil placed, or simply a lump sum. Appellant seeks $53,104.80. The parties waived a hearing and submitted the appeal on the record under Board Rule 11. The Board denies the appeal.

FINDINGS OF FACT

1. The parties entered into the above-captioned contract for greenspace restoration on February 15, 2019. The work included the replacement of topsoil and the planting of sod and trees along the median of Jefferson Avenue in Orleans Parish, Louisiana at a price of $747,298.57. (R4, tab 9 at 1, 3-5, 39, 44)[1]

2. The Corps issued the solicitation on November 16, 2018 (R4, tab 4 at 1). The bid schedule for the solicitation listed an "estimated quantity" of 2,355 cubic yards (CY) of topsoil and requested unit price bids, which would result in an "estimated amount" for that contract line item number (CLIN 0002). Note 1 to the bid schedule provided that:

> **The Contractor shall verify all quantities on the plan;
> quantities are provided as an aid to bidders only.**

---

[1] Rule 4 citations are to the .pdf page number in the electronic file.

**Quantity takeoff mistakes made by the Contractor shall
be no cause for additional costs to the Government.**

(R4, tab 4 at 8) (emphasis in original)  The bid schedule, with Jemison's bid numbers, was included in the contract but the word "estimated" was omitted from the column heading so that "Estimated Quantity" became "QTY" and "Estimated Amount" became "Total Amount."  Note 1, however, was included in the contract (R4, tab 9 at 41).

3.  The Standard Form 1449 Continuation Sheet in the solicitation (and the contract) identified CLIN 0002 as "FFP" or firm-fixed price (R4, tab 4 at 3; tab 9 at 3). The Board finds that a reasonably prudent bidder would have understood from reading the Continuation Sheet in conjunction with the Bid Schedule that the price per CY was fixed but the quantity of topsoil was an estimate.

4.  The Payment Procedures section of the solicitation, at Section 1.4, Payments to the Contractor, required the submission of invoices and "quantity backup data by the [c]ontractor," and provided that upon initial site work acceptance Jemison would be paid "100% contract cost for topsoil" (R4, tab 4 at 15).  This provision was included in the contract (R4, tab 9 at 48).

5.  The Excavation and Fill section of the solicitation at Part 4, Measurement and Payment, provided:

> Measurement for work required under this section shall be an in place topsoil cubic yard measurement.  The topsoil quantities are provided as an aid to bidders only.  The contractor shall take measurements subtracting rootball volume at each area requiring excavation and soil replacement. . .

(R4, tab 4 at 34, 43) This provision was included in the contract (R4, tab 9 at 76).

6.  Jemison submitted various questions to the Corps during negotiation of the contract.  The Corps answered a question from Jemison related to the topsoil in an amendment to the solicitation issued on January 28, 2019:

> Q1.  . . . [C]an we retain the same estimated quantities for top soil and add a qualification in the revised proposal that the actual quantities utilized will be verified by the USACE in the field?  It is our understanding the USACE carefully confirms material quantities (such as top soil) in the field as work progresses.  We understand that the

USACE will only pay for verified materials used in the project.

A1. . . . Measurement for this work shall be an in place top soil cubic yard measurement verified by the government. The topsoil quantities are provided as an aid to the bidder. The actual topsoil quantities used cannot exceed the government's estimated quantities without a contract modification.

(R4, tab 7 at 2) The question and answer were included in the contract (R4, tab 9 at 15).

7. The Board finds based on Jemison's use of the phrases "[i]t is our understanding the USACE carefully confirms material quantities (such as top soil)," and "[w]e understand that the USACE will only pay for verified materials used in the project," that Jemison understood that the Corps intended to measure in-place quantities and pay only for the topsoil placed.

8. Jemison submitted a final proposal on February 6, 2019. The final proposal included an "Estimated Quantity" for CLIN 0002 of 2,355 CY, at a unit price of $84, for an "Estimated Amount" of $197,820. Jemison added a note that stated:

The top soil estimate assumes the maximum cubic yards for the purpose of this bid proposal. In reality, the landscaping contractor does not anticipate using this volume of top soil and understands the top soil will be field verified by the USACE. . . .

(R4, tab 8 at 2)

9. The Board finds based on Jemison's statement that the topsoil would be "field verified" that it continued to understand that payment would be for actual verified quantities. The Board further finds that Jemison or its subcontractor had conducted a takeoff of the amount of topsoil to be placed and had determined that the estimate in the solicitation was high.

10. The contract incorporated Federal Acquisition Regulation (FAR) 52.212-4, COMMERCIAL TERMS AND CONDITIONS – COMMERCIAL ITEMS (OCT 2018) (R4, tab 9 at 27). This clause contains the following terms relating to invoice and payment:

(g) Invoice.

3

(1) The Contractor shall submit an original invoice . . . to the address designated in the contract to receive invoices. An invoice must include—

. . .

(iv) Description, quantity, unit of measure, unit price and extended price of the items delivered;

. . .

(i)     Payment—

(1) Items accepted. Payment shall be made for items accepted by the Government that have been delivered to the delivery destinations set forth in this contract.

FAR 52.212-4(g) & (i) (emphasis added)

11. Jemison began performance; all was well through the first two pay requests. In the first pay request for the period through April 30, 2019, Jemison requested payment for 452.78 CY of topsoil at $84/CY for a total of $38,033.52, which the Corps approved (R4, tab 11 at 2, 5).

12. In the second payment request for the period from May 1 to August 12, 2019, Jemison requested payment for an additional 1,206.61 CY of topsoil at $84/CY for a total of $101,355.24, which the Corps also approved (R4, tab 13 at 2, 8).

13. With this second payment request, Jemison included an updated planting log (*see* R4, tab 13 at 1). Consistent with the direction in the Measurement and Payment clause that "[t]he contractor shall take measurements subtracting rootball volume at each area requiring excavation and soil replacement," the planting log showed an excavation quantity, a deduction for the rootball of the tree(s), and the resulting topsoil quantity (finding 5). For example, the first entry in the log, at station 1442, shows an excavation of 11.11 CY, minus a rootball of 0.125, resulting in a (rounded) topsoil quantity of 10.99 CY.[2] After 15 pages of such calculations, the planting log showed a topsoil quantity of 1,659.39 CY, which is the sum of the

---

[2] The planting log submitted with the first payment request included the excavation and topsoil quantities, from which the rootball deduction can be calculated, but it did not explicitly state the rootball numbers (R4, tab 12).

4

amounts requested in the first two pay applications. (R4, tab 14 at 1, 15)

14. The parties conducted a final walk through of the project site on August 23, 2019 (ex. A-13), or 11 days after the last day of the period for the second pay request (R4, tab 13). After the second pay request, Jemison placed a small amount of topsoil. The final planting log showed the total topsoil placed as 1,722.80, or 632.2 CY less than the estimated amount in the solicitation (R4, tab 19 at 12).

15. Jemison submitted a third pay request on October 19, 2019. In this pay request, Jemison requested payment of an additional $58,432 for topsoil, which represented the full $197,820 for CLIN 0002, minus the amounts already paid. (R4, tab 16) After the contracting officer's representative informed Jemison it was entitled only to the actual quantity placed (R4, tab 17 at 2), Jemison submitted a revised pay request no. 3 on November 3, 2019, which sought payment for 63.41 CY amounting to $5,326.44. The Corps approved the payment. (R4, tab 18 at 2, 5)

16. On January 4, 2021, Jemison submitted a claim for what it contended was the unpaid balance of $53,104.80 for the topsoil (R4, tab 3).

17. The contracting officer (CO) denied the claim in a March 3, 2021 final decision (R4, tab 2).

18. While the appeal is only for topsoil, the Board observes that the contract had comparable provisions related to the placement of sod. Thus, the Bid Schedule listed an estimated quantity of 27,210 square feet (SF) of sod; Note 1 quoted in finding 2 above applied equally to the sod (R4, tab 4 at 8). Further, the Sodding section of the contract at Part 4, Measurement and Payment, contained language nearly identical to that in the Excavation and Fill section (R4, tab 9 at 85, 88). Jemison bid the sod at $2.00/SF (R4, tab 9 at 3).

19. When Jemison completed work on the contract the parties agreed that Jemison had placed more sod than the 27,210 SF estimate. The CO did not cap payment at this amount and paid Jemison for a total of 35,000 square feet of sod, including about 3,000 SF of sod that Jemison replaced due to damage (R4, tab 17 at 2).

20. Jemison filed a timely appeal on May 11, 2021.

<u>DECISION</u>

The contracting method employed here - soliciting bids for unit prices based on estimated quantities and then paying for actual quantities - is a contractual tool that has long been at the government's disposal. *E.g.*, *Hirsch v. United States*, 104 Ct. Cl. 45, 55- 57 (1945); *see Fidelity Const. Co. v. United States*, 700 F.2d 1379, 1381-82 (Fed.

Cir. 1983) ("The contract was not a lump sum fixed price contract, as 13 of the 20 bid items called for the submission of unit prices on the basis of an estimated quantity stated for each item. The parties used an estimated contract price of $176,999.99 for accounting and budgeting purposes.") As a result, in disputes involving this type of contract, the contractor typically attacks the reasonableness of the estimated quantity, not the method of calculating payment. *E.g., Burnham Associates, Inc.*, ASBCA No. 60780, 18-1 BCA ¶ 36,934 at 179,939-40 (contractor contended Corps misrepresented quantities when solicitation estimated 525 CY of rock to be removed but only 430 CY was present). But Jemison does not contend that the Corps lacked a good faith basis for estimating 2,355 CY of topsoil. Rather, it contends that this was a lump sum contract and it is entitled to be paid for the full CLIN 0002 topsoil price.

We start with the plain language of the contract, which we must interpret to give reasonable meaning to all its parts. *Gardiner, Kamya & Assocs., P.C. v. Jackson*, 467 F.3d 1348, 1353 (Fed. Cir. 2006). We may not use extrinsic evidence to change the terms of a contract that are clear on its face. *Interwest Construction v. Brown*, 29 F.3d 611, 615 (Fed. Cir. 1994). When a provision in a contract is susceptible to more than one reasonable interpretation, it is ambiguous and the Board may then resort to extrinsic evidence to resolve the ambiguity. *TEG-Paradigm Envtl., Inc. v. United States*, 465 F.3d 1329, 1338 (Fed. Cir. 2006). The extrinsic evidence that the Board may consider includes the conduct of the parties before the dispute, which can be illuminating and may be given great weight. *Metropolitan Area Transit, Inc. v. Nicholson*, 463 F.3d 1256, 1260 (Fed. Cir. 2006); *Blinderman Constr. Co. v. United States*, 695 F.2d 552, 558 (Fed. Cir. 1982).

Reading the contract as a whole, the Board agrees with the Corps that Jemison was entitled to payment only for actual quantities placed. First, the contract format – calculating CLINs by multiplying unit prices by estimated quantities – itself indicates that payment will be for actual quantities. *Hirsch*, 104 Ct. Cl. at 56-57. Second, the incorporated Commercial Items clause instructs the contractor to invoice for items "delivered" and states that the government will pay for items "accepted" and "delivered" (finding 10). The use of the word "delivered" is incompatible with Jemison's contention that it is entitled to payment for 632.2 CY of topsoil that it did not deliver to the project. Third, the note on the bid schedule clearly conveys that while the Corps provided the estimated quantities as an aid, the contractor was responsible for conducting its own quantity takeoffs and if it failed to do so accurately, it could not seek more money from the Corps (finding 2). This placed the risk of a quantity underrun on Jemison and it had to account for that risk in its bid price. Fourth, the Measurement and Payment clause confirms that the government will pay for actual quantities when it speaks of "an in place topsoil cubic yard measurement" (finding 5).

6

As Jemison observes in its brief, there is no sentence in the contract that specifically states that the Corps will pay only for actual quantities placed. Clearly, the CO could have avoided this by writing the Measurement and Payment clause so that it specifically stated that not only measurement, but payment as well would be for in place quantities. Despite this, for the reasons stated in the preceding paragraph, the Board believes that the contract when read as a whole is clear. Nevertheless, even if we credited Jemison's argument and deemed the contract to be ambiguous, the Corps still prevails. Indeed, what is really striking about this appeal is that the extrinsic evidence provides such convincing proof that Jemison understood both that the Corps would only pay for actual quantities and that the topsoil estimate in the solicitation was too high.

Thus, when a contractor states to the Corps prior to award that "[i]t is our understanding the USACE carefully confirms material quantities . . . [and] [w]e understand that the USACE will only pay for verified materials used in the project" (finding 6), the contractor cannot come back later and contend that it did not know that payment would be for verified materials. Similarly, when the contractor has stated in its final proposal that it "does not anticipate using this volume of top soil and understands the top soil will be field verified by the USACE" (finding 8), it has disclosed knowledge of the quantity underrun and reiterated its understanding that the Corps would verify quantities. And finally, when that proposal lists the amount of topsoil as an "Estimated Quantity" and states that the price is an "Estimated Amount" (finding 8), the contractor cannot return post award and credibly argue that both were guaranteed, not estimated.

When "'a contractor seeks recovery based on his interpretation of an ambiguous contract, he must show that he relied on this interpretation in submitting his bid.'" *Lear Siegler Mgmt. Servs. Corp. v. United States*, 867 F.2d 600, 603 (Fed. Cir. 1989) (quoting *Edward R. Marden Corp. v. United States*, 803 F.2d 701, 705 (Fed. Cir.1986)). The extrinsic evidence clearly demonstrates that Jemison knew that it would be paid for actual quantities and that it had determined there would be a quantity underrun. Thus, even if the Board agreed that the contract was ambiguous, Jemison would still not be entitled to recover.

Finally, the Board also finds that the Corps' payment, prior to this dispute, for sod that exceeded the estimated quantity in the contract (finding 18), is also evidence of an understanding that payment would be for actual quantities.

Jemison relies on *Blough v. United States*, 17 Cl. Ct. 186 (1989) an opinion that is not binding on the Board but which presented a similar issue – whether the contract was for a lump sum or unit prices. But that case arose from facts that are too dissimilar to this appeal. Among other things, in that case the language which suggested that the contract was for unit prices was contained only in a work sheet.

7

Moreover, the CO "unequivocally stated" to the contractor on two occasions during the award period that the contract was for a lump sum. *Id.* at 188. The court found that, "[n]either the award nor the award letter made reference to or in any way suggested a unit price." *Id.* at 190. The court also found it significant that the agency had made it clear to the plaintiff on a separate contract for similar work that the contract was for a unit price. *Id.* at 190. None of these facts are present in this appeal.

Jemison also makes a variety of arguments concerning the type of contract selected (app. br. at 15-17). Among other things, it asserts that this was not a unit price contract (*e.g.*, app. br. at 1), which is puzzling because the solicitation, Jemison's proposal, and the contract are all based on a unit price for CY of topsoil (findings 2, 8).

Jemison also contends that this contract was not properly designated as a commercial items contract by the CO and that the contract was really a construction contract (app. br. at 16, n.1). From there, it cites FAR 36.207, which provides that "[g]enerally, firm-fixed-price contracts shall be used to acquire construction." FAR 36.207(b) provides that "[l]ump-sum pricing shall be used in preference to unit pricing. . ." unless the contract falls under one of four exceptions. If Jemison disagreed with the CO's decision to categorize this contract as a commercial items rather than a construction contract, and if it disagreed with her decision to base the contract on unit prices, it should have raised these issues prior to award. Contractors cannot remain silent on such issues and roll them out in the event of a dispute. Jemison waived the argument by not raising it prior to award. *Assist Consultants, Inc.*, ASBCA Nos. 61525, 62090, 21- 1 BCA ¶ 37,850 at 183,807. In any event, FAR 36.207(b) permits the use of unit pricing where "[q]uantities of work, such as excavation, cannot be estimated with sufficient confidence to permit a lump-sum offer without a substantial contingency." Jemison has not demonstrated that the Corps could have estimated quantities with sufficient confidence to permit a lump-sum offer without contingency.

CONCLUSION

The appeal is denied.

Dated: December 5, 2022

_____
MICHAEL N. O'CONNELL
Administrative Judge
Armed Services Board
of Contract Appeals

(Signatures continued)

8

I concur                                    I concur

RICHARD SHACKLEFORD                         OWEN C. WILSON
Administrative Judge                        Administrative Judge
Acting Chairman                             Vice Chairman
Armed Services Board                        Armed Services Board
of Contract Appeals                         of Contract Appeals


I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 62928, Appeal of Jemison & Partners, Inc., rendered in conformance with the Board's Charter.

Dated:  December 7, 2022

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals