ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of - | ) |
| | ) |
| IMC Construction Group | ) ASBCA No. 62422 |
| | ) |
| Under Contract No. W91278-16-D-0037 | ) |

APPEARANCE FOR THE APPELLANT: Thomas J. Tollefsen, Esq.
　　Tritt & Associates, P.A.
　　Jacksonville, FL

APPEARANCES FOR THE GOVERNMENT: Michael P. Goodman, Esq.
　　Engineer Chief Trial Attorney
　　David C. Brasfield, Jr., Esq.
　　Kathleen P. Miller, Esq.
　　Engineer Trial Attorneys
　　U.S. Army Engineer District, Mobile

OPINION BY ADMINISTRATIVE JUDGE MCLISH

IMC Construction Group (IMC) appeals from a denial of its claim seeking $326,865, based upon a task order contract with the United States Army Corps of Engineers (USACE, or the government) to install a cooling tower upgrade system at Maxwell Air Force Base in Alabama. The sole issue in dispute is whether the task order required IMC to provide a Direct Digital Control (DDC) system. IMC claims that it understood the task order specifications to indicate that the government would provide the DDC system through a contract with a provider specializing in such systems. After task order award, the government informed IMC that IMC was required to provide the DDC system by subcontracting with the government's provider. IMC did so and now seeks an equitable adjustment to the task order price to compensate it for the unexpected expense of providing the DDC system.

The parties elected to proceed without an evidentiary hearing, via Board Rule 11, with each side relying upon the Rule 4 file and its supplements and submitting briefs in accordance with an agreed-upon schedule. After careful consideration of the record and the parties' submissions, we grant the appeal as to both entitlement and quantum.

FINDINGS OF FACT

1. Contract No. W91278-16-D-0037 is an Indefinite Delivery/Indefinite Quantity (IDIQ) Multiple Award Contract (MATOC) (Contract) awarded to Islands Mechanical Contractor, Inc. d/b/a IMC Construction Group (IMC) on or about

December 23, 2015 (R4, tab 4 at 1, 4).  The Contract included the clause at Federal Acquisition Regulation (FAR) 52.243- 4, CHANGES (JUN 2007) (*id.* at 28).

2.    On or about May 15, 2018, USACE issued Request for Proposals No. W91278-18-SFSB-0004 (RFP) for a task order under the Contract to install a cooling tower upgrade system at Gunter Annex, Maxwell Air Force Base, Montgomery County, Alabama (R4, tab 5 at 3, 6).  The RFP stated that the "approximate Cost Range" for the project was estimated to be between $500,000 and $1,000,000 and the "Programmed Amount" was $800,000 (*id*. at 3).

3.  The RFP was amended three times (R4, tabs G-1, G-4, 6).

I.  **The Relevant RFP Provisions**

4.    Regarding control systems, the RFP included Specification Section 23 09 23, DDC for HVAC and other Local Building Systems (R4, tab 5 at 289).  That section states "Refer to [Defense Information Systems Agency (DISA)] Controls specifications DIV 23 and DIV 25" (*id.*).

5.    Division 23 (DIV 23) and Division 25 (DIV 25) were Appendix B and C, respectively, to the specifications (*id*. at 413-494).  Appendix B, DIV 23, is entitled, 23 09 00, Instrumentation and Control for HVAC (*id*. at 413).  Specification 23 09 23 of Appendix B covers DDC systems for HVAC, and has one subsection, 23 09 23.13, BACnet DDC systems for HVAC (*id.* at 415).  Appendix C, DIV 25, Integrated Automation, provides technical provisions concerning Integrated Automation systems (*id.* at 441).

6.  Drawings M-602 and M-603, both titled "Condenser Water Control," provide diagrams that appear to include aspects of the DDC system (R4, tab 6 at 16-17).  Both drawings include a legend indicating that they are "Concept – Not for Const[ruction]" (*id.*).  Drawing M-604, titled "Sequence of Operations," included a number of statements regarding required operations of the "BAS Controller" and indicated that aspects of the control system would be confirmed during commissioning (*id*. at 18).[1]

---

[1] In its brief, the government makes a number of assertions about how these drawings should be interpreted with regard to the control systems (gov't br. at 4-7), but introduced no supporting evidence, such as an affidavit from an expert or other individual with sufficient expertise.  We decline to credit the unsupported assertions of counsel.

7. Appendix B, DIV 23, states in pertinent part as follows:

>ES521 [DISA Facilities Engineering] shall maintain a contract to maintain, repair, and install DDC systems. The contract shall have the ability to deliver DDC services to any DISA ESD [Enterprise Services Directorate] facilities.
>
>The ES521 DDC program shall work closely with the ES521 BOS/O&M program to ensure that the programs do not duplicate efforts or create contractual conflicts or disputes.

(R4, tab 5 at 416).

8. Appendix C, DIV 25, provided that:

>All infrastructure equipment and all HVAC systems for administrative, mechanical plant and datacenter areas shall be monitored and controlled through a facility Building Automation System (BAS) . . . . All installation, connection of new equipment, and maintenance on BAS systems and components shall be conducted <u>solely</u> by the enterprise BAS Service Provider.

>. . . .

>The BAS, also known as an integrated automation system, consists of the hardware and software necessary to provide monitoring and control of infrastructure equipment and systems that support the facility.

>The purpose of this Division is to define the configuration, interaction, and materials for the connection, monitoring, user interface and reporting of electrical systems, life safety systems and mechanical plant DDC systems (specified in Division 23).

(*Id.* at 443) (emphasis in original). Appendix C further states at subsection 25 01 00, Installation, Operation and Maintenance of Integrated Automation:

>Integrated Automation Enterprise Contract

3

ES521 shall maintain a contract to maintain, repair, and install the integrated automation systems outlined by this section and Division 23. The contract shall be able to deliver integrated automation services (installation, modification, preventative maintenance, and repair) to all facilities and BAS systems under the purview of ES521. All installations, connections of new equipment, and maintenance on systems & components shall be conducted <u>solely</u> by the enterprise integrated automation Service Provider. No other Service Provider shall be authorized to install equipment upon, modify, or otherwise interfere with these systems because of security, contract, and warranty obligations.

(*Id.* at 444) (emphasis in original).

9. The "BAS Service Provider" and "integrated automation Service Provider" referenced in DIV 25 is the same government provider that must perform any installation, modification, or repair to the DDC system under DIV 23 (gov't. reply br. at 7-8). For Gunter Annex, Maxwell Air Force Base, that provider is an entity named SPEC, LLC (SPEC) (*id;* R4, tabs 11, 10).

10. The RFP did not identify SPEC as the "BAS Service Provider" and "integrated automation Service Provider" referenced in DIV 25. It also did not provide any information on how an offeror for the task order could learn the identity of that provider. (R4, tab 5 at 443-44)

11. The specifications and drawings did not include an express statement to the effect that the contractor shall provide the DDC system. This contrasts with other provisions in the specifications. For example, the specifications provided that testing, adjusting and balancing (TAB) of the HVAC systems could only be provided by TAB specialists meeting strict requirements and approved by the government (R4, tab 5 at 254-55), but also made clear that TAB was within the contractor's scope of work (*id.* at 251 ("The work includes and [sic] testing, adjusting and balancing (TAB) of new and existing cooling (HVAC) water distribution systems . . . ."); ("Perform TAB in accordance with the requirements of the TAB procedural standard . . . ."); ("Conduct TAB of the indicated existing systems . . . .").

## II. **IMC's Proposal**

12. IMC submitted a proposal for the task order on or about July 13, 2018, with a total price of $1,796,176 (R4, tab G-08). IMC's proposal indicated that IMC intended to self-perform 100% of the task order work (*id.*). IMC did not obtain any

subcontractor quotations to provide and install the DDC System prior to submitting its proposal (R4, tab G-13 at 1).  IMC's internal pre-proposal budget for the project included $43,000 for controls (R4, tabs G-12a1, row 59 ("Automation Facility Controls"); G-12a2 at 5 ("DDC Controls"); G-13 at 1).

### III.  Task Order Award and Communications Regarding the DDC System

13.  The government awarded IMC awarded Task Order No. W9127818F0494 in the amount of $1,796,176.00 on or about September 10, 2018 (R4, tab 7).

14.  IMC's initial schedule submitted on November 13, 2018, showed a budget amount of $75,174.00 for Schedule Activity CPCP 1130, Controls and Wiring, and $11,328.00 for Schedule Activity CPCP 1150, Final Controls Connection and Programming (R4, tab 8 at 2).

15.  IMC submitted a request for information (RFI) on January 4, 2019, seeking the name of the manufacturer for the existing HVAC DDC System components, and the contact information for the current BAS Service Provider (R4, tab 9).  The Government responded to the RFI on January 7, 2019, by providing an information package for SPEC (*id*.).

16.  By email to SPEC dated January 8, 2019, IMC requested a price quotation for the DDC and BAS requirements of the Building 857 Cooling Tower Project (R4, tab 10 at 2).  The email stated as follows:

> Good afternoon Mr. Howard and Mr. Yankowski!  I was given your contact information from Mr. Willard Williams, Project Engineer USACE. We have been awarded the Cooling Tower Upgrade at Maxwell AFB, Gunter Annex, at the DISA building and we will require DDC for the project. Mr. Williams has informed me that SPEC LLC is the service provider for all DISA facilities for building automation systems.
>
> IMC would like to know if SPEC LLC could provide a price quotation for the BAS/DDC scope of work needed for this project? I am going to attach the specifications below in a shared Link.

(*Id*.).  SPEC LLC responded on January 10, 2019, with a proposed price of $283,000 (*id.* at 1, 20).  The response from SPEC LLC indicated that it had provided a quote to several companies stating:

We are the BAS service provider for all DISA facilities and are familiar with the project as we sent bids out to several companies when the bid originally came out last July. I'm not sure how we missed your company on the bidders list but we have attached the same cost proposal we sent out to all the other contractors.

(*Id.* at 1).

17. In advance of the task order proposal deadline, SPEC had provided quotations to two different mechanical contractors that were materially identical to the proposal it later provided to IMC (R4, tabs G-06, G-06a1, G-07 and G-07a1). There is no evidence in the record that any offeror for the task order relied upon or incorporated a proposal from SPEC.

18. IMC's preliminary schedule, dated January 23, 2019, continued to show a budget amount of $75,174.00 for Schedule Activity CPCP 1130, Controls and Wiring, and $11,328 for Schedule Activity CPCP 1150, Final Controls Connection and Programming (R4, tabs 13, G-13 at 2).

19. By letter dated January 25, 2019, IMC wrote to the USACE Administrative Contracting Officer (ACO) stating that "With the combination of the absence of mention of SPEC LLC at the time of the pre-bid site visit, the verbiage in the RFP and the government response to RFI-003; IMC is requesting a review and, ultimately, an equitable adjustment to contract with SPEC LLC for this project" (R4, tab 14 at 2).

20. The ACO responded to IMC with a letter dated January 30, 2019, stating that there was no justification for an equitable adjustment because DIV 25 of the RFP required IMC to utilize SPEC as the enterprise service provider and any questions related to same should have been submitted prior to IMC's bid (R4, tab 16).

21. IMC wrote back to the ACO on February 11, 2019, to further explain its justification for its request for equitable adjustment (R4, tab 17). IMC's letter stated that IMC did not consider the controls to be part of its task order and had understood that it would be installed by the government's enterprise service provider under the contract referenced in DIV 23 and DIV 25:

> During the pre-proposal process, IMC reviewed these specification sections and, in our interpretation, determined that the Chief of Facilities Engineering should have a contract in-place to perform the necessary install of the integration automation systems needed. We came to this conclusion based on verbiage found within the Appendix

6

DIV 23 and DIV 25 specifications. In addition, the pre-bid site visit provided no information to change or modify the specification language nor was the name or contact info of the enterprise BAS service provider provided during the pre-proposal period.

(*Id*. at 1).

22. The ACO responded to IMC's February 2019 letter with a letter dated March 12, 2019, denying the REA (R4, tab 019). The letter stated:

Reference is made to contract drawings M-602, M-603, and M-604. These drawings clearly show the scope of the new controls work required for the contract and include adequate information to have provided a bid for the project utilizing a proposal from the enterprise integrated automation Service Provider in accordance with Appendix C, Division 25 INTEGRATED AUTOMATION.

(*Id.* at 1).

23. As directed by the government, IMC subcontracted with SPEC to provide the DDC system. The subcontract price was $283,000. (R4, tab G-13 at 2)

24. IMC requested a contracting officer's final decision on or about September 24, 2019. IMC requested an equitable adjustment to the task order in the amount of $326,865, consisting of the amount of the SPEC cost proposal plus overhead and profit of 15.5%. (R4, tab 1)

25. On or about December 5, 2019, the contracting officer issued a final decision. The contracting officer concluded that the DDC/Integrated Automation System work and the requirement to utilize SPEC to perform that work was included in the task order requirements and is within the scope of the task order. Accordingly, the contracting officer found that IMC should have included that cost in its bid and therefore the claim for equitable adjustment was denied. (R4, tab 3)

26. On or about February 26, 2020, IMC filed this appeal.

DECISION

## I.  **Standard of Review**

Board Rule 11 permits parties "to waive a hearing and to submit [their] case upon the record."  *Reed Int'l, Inc.*, ASBCA No. 61451 et al., 20-1 BCA ¶ 37,587 at 182,513 (citing *DG21, LLC*, ASBCA No. 57980, 15-1 BCA ¶ 36,016 at 175,909 n.1).  Unlike a motion for summary judgment, which must be adjudicated on the basis of undisputed facts, when resolving an appeal under Board Rule 11, the Board "may make findings of fact on disputed facts."  *Grumman Aerospace Corp.*, ASBCA No. 35185, 92-3 BCA ¶ 25,059 at 124,886 n.13.

## II.  **Contract Interpretation**

The issue before us is one of contract interpretation.  "Contract interpretation begins with the language of the written agreement."  *NOAA Maryland, LLC v. Adm'r of Gen. Servs. Admin.*, 997 F.3d 1159, 1165-66 (Fed. Cir. 2021) (quoting *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004)).  The plain and unambiguous meaning of a written agreement controls.  *Id*.  We must give the contract "that meaning that would be derived from the contract by a reasonably intelligent person acquainted with the contemporaneous circumstances."  *TEG-Paradigm Env't, Inc. v. United States*, 465 F.3d 1329, 1338 (Fed. Cir. 2006) (quoting *Metric Constructors, Inc. v. Nat'l Aeronautics & Space Admin.,* 169 F.3d 747, 752 (Fed.Cir.1999)).  We interpret contracts "'in a manner that gives meaning to all of its provisions and makes sense,'" *NOAA Maryland*, 997 F.3d at 1166 (quoting *Langkamp v. United States*, 943 F.3d 1346, 1353 (Fed. Cir. 2019)), and we seek to "'avoid[ ] conflict or surplusage of [the contract's] provisions,'" *Id.* (quoting *United Int'l Investigative Servs. v. United States*, 109 F.3d 734, 737 (Fed. Cir. 1997)).

When the contract language is unambiguous, we give it its "plain and ordinary" meaning and may not look to extrinsic evidence to interpret it.  *TEG-Paradigm*, 465 F.3d at 1338.  Although extrinsic evidence may not be used to interpret an unambiguous contract provision, it may be considered for the purpose of confirming that the parties intended for the term to have its plain and ordinary meaning.  *Id.* When a provision in a contract is susceptible to more than one reasonable interpretation, it is ambiguous, and we may consider extrinsic evidence to resolve the ambiguity.  *Id.*; *Jemison & Partners, Inc.*, ASBCA No. 62928, 23-1 BCA ¶ 38,249 at 185,737.  The purpose of resorting to extrinsic evidence is to arrive at an interpretation that effectuates the parties' intent at the time of contracting.  *TEG-Paradigm*, 465 F.3d at 1338.  Appropriate extrinsic evidence may include such things as the parties' negotiating history, their pre-dispute conduct, the circumstances under which they executed the contract and trade practice and custom.  *Gardiner, Kamya & Assocs., P.C. v. Jackson*, 467 F.3d 1348, 1354 (Fed. Cir. 2006); *TEG-Paradigm*, 465 F.3d at

1338; *Metropolitan Area Transit, Inc. v. Nicholson*, 463 F.3d 1256, 1260 (Fed. Cir. 2006).

If the ambiguity is not resolved by consideration of the contract as a whole and extrinsic evidence, then the doctrine of *contra proferentem* comes into play. *Gardiner*, 467 F.3d at 1352. Under that doctrine, we resolve ambiguities against the party that drafted the contract. *Id. Contra proferentem* is a "rule of last resort" that "is applied only where there is a genuine ambiguity and where, after examining the entire contract, the relation of the parties and the circumstances under which they executed the contract, the ambiguity remains unresolved." *Id.* (quoting *Lewis v. United States,* 1982 WL 36718, at *7 (recommended decision adopted as the judgment of the Court of Claims in 231 Ct. Cl. 799, 800 (1982))). The doctrine is inapplicable if the intention of the parties can otherwise be discerned. *HPI/GSA 3C, LLC v. Perry*, 364 F.3d 1327, 1334 (Fed. Cir. 2004).

Finally, an exception to *contra proferentem* applies if the ambiguity is patent, rather than latent. *States Roofing Corp. v. Winter*, 587 F.3d 1364, 1372 (Fed. Cir. 2009). A "patent ambiguity" is one that is "obvious, gross, glaring, so that plaintiff contractor had a duty to inquire about it at the start." *Id.* (quoting *H & M Moving, Inc. v. United States*, 499 F.2d 660, 671 (Ct. Cl. 1974). Where the ambiguity is patent, the non-drafting party has a duty to inquire and a failure to do so will result in the ambiguity being resolved against it. *Id.* Where the ambiguity is not glaring or obvious, no patent ambiguity exists. *Id.* The bar to proving patent ambiguity is necessarily high. *Metro Mach. DBA Gen. Dynamics Nassco-Norfolk*, ASBCA No. 61817, 20-1 BCA. ¶ 37,633 at 182,717 (quoting *LAI Services, Inc. v. Gates*, 573 F.3d 1306, 1315-16 (Fed. Cir. 2009). Contractors are not required to seek clarification of "any and all ambiguities, doubts, or possible differences in interpretation." *States Roofing Corp. v. Winter*, 587 F.3d 1364,1372 (quoting *WPC Enters., Inc. v. United States,* 323 F.2d 874, 877 (Ct. Cl. 1963)). Contractors "are not expected to exercise clairvoyance in spotting hidden ambiguities in the bid documents, and they are protected if they innocently construe in their own favor an ambiguity equally susceptible to another construction . . . ." *Blount Bros. Const. Co. v. United States*, 346 F.2d 962, 973 (Ct. Cl. 1965). "[T]he basic precept is that ambiguities in contracts drawn by the Government are construed against the drafter." *Id.*

III.  **The Task Order Language**

Beginning with the relevant language of the task order, we first note that there is no language expressly stating that the contractor is required to provide and install the referenced DDC controls (finding 11). Instead, specifications DIV 23 and DIV 25 provide that (1) the government maintains a contract with a BAS Service Provider/integrated automation Service Provider to maintain, repair, and install the integrated automation systems and (2) all installations, connections of new equipment,

and maintenance on those systems and components are to be conducted "solely" by the government's provider (findings 7-8). The most natural reading of the task order language is that the DDC controls will be provided and installed via the government's separate contract with its provider, and the task order contractor is forbidden from performing that work.

The government's arguments against this interpretation of the task order language are unpersuasive. The government contends that our reading renders superfluous the specifications for the DDC system and related notations on contract drawings M-6-3, M-6-3 and M-604. It argues that the only way to harmonize the inclusion of the DDC control specifications and the requirement that all work on the controls be performed by the government's provider is to conclude that the task order required IMC to provide the DDC controls through a subcontract with the government's provider. An alternative way to harmonize the task order, however, is readily apparent: the DDC system information was included for the contractor's information, as the contractor would need to coordinate with the provider of the DDC system and ensure that system was properly integrated with the other work.

In addition, the government's reading creates problems of its own. It is unusual for the government to direct the use of a particular subcontractor. If the government intended to do so here, we would expect that the task order would make that intention clear. It would also identify the mandatory subcontractor by name. The task order did neither (finding 10) We find it difficult to fathom why the task order language would be written as it is if the intent were to require the contractor to subcontract with a specific government-mandated provider. In particular, the omission from the RFP of the name of the mandated provider renders the government's interpretation strained, to say the least.

Also problematic for the government's interpretation is the task order's strict prohibition against any entity other than the government's provider performing any of the DDC system installation work (finding 8). As the prime contractor, IMC was obligated to perform all of the work required by the task order. Typically, a prime contractor meets its obligation by performing the work itself or subcontracting some or all of the work to others. In either event, however, the prime contractor remains bound to ensure the work is performed in accordance with the contract requirements. If the work is deficient, the prime contractor will be directly liable to the government, absent some acceptable excuse. *Todd Const., L.P. v. United States*, 656 F.3d 1306, 1316 (Fed. Cir. 2011) ("a contractor is responsible for the unexcused performance failures of its subcontractors." (quoting *Johnson Mgm't Grp. CFC, Inc. v. Martinez,* 308 F.3d 1245, 1252 (Fed.Cir.2002))). As a result, the government's reading of the task order results in IMC being obligated, in an important sense, to install the DDC system. The task order, however, was explicit that the installation was to be performed "solely" by the government's provider (finding 8). That language is incompatible with an

10

interpretation that IMC was not only permitted, but required, to take on the contractual obligation to install the system.

The government relies on *JAAAT Technical Services, LLC*, ASBCA No. 61180, 19-1 BCA ¶ 37,297, for the proposition that the mere inclusion of specifications relating to a system indicates that the system is required (gov't br. at 13-14). In that case, the dispute was whether the contractor's scope of work included providing an access control system. In multiple places, the task order stated "[a]ccess control system as well as junction boxes and conduits for other systems are part of this project's scope." *JAAAT,* 19-1 BCA ¶ 37,297 at 181,430. The Board concluded that the access control system was required. *Id.* at 181,430-32. Here, by contrast, the task order contained no such definitive statement indicating that the DDC system was within the contractor's scope of work, while it did contain language reasonably suggesting that it was not. *JAAAT*, therefore, is distinguishable from this case.

Reading it as a whole, we conclude that the task order did not require IMC to provide the DDC system. As a result, the government changed the task order when it directed IMC to provide and install the DDC system via a subcontract with the government's provider. IMC is therefore entitled to an equitable adjustment to the task order price.

IV. **The Extrinsic Evidence**

Even if we were to credit the government's argument that the task order was ambiguous, the extrinsic evidence in the record does not change the result. The government contends that the extrinsic evidence shows that IMC understood from the outset that it was required to provide the DDC system by subcontracting with the government's provider. We find that IMC's pre-award conduct indicates the opposite. Had it understood that it would be required to subcontract with the government's unnamed provider, IMC would have asked for the provider's name and sought a proposal from that provider. It did neither (finding 12). IMC also would not have indicated in its proposal that it intended to self-perform all of the work (*id.*).

The government's theory is also quite implausible. The government suggests that IMC understood that the government was going to require it to provide the DDC system through a subcontract with the unnamed provider referenced in DIVs 23 and 25 but chose not even to ask the government who the provider was, much less obtain a subcontract proposal, before submitting its proposal. Under this theory, IMC was either negligent to the point of recklessness or it deviously intended to win the Task Order with a scheme to deliberately underbid the job and then feign surprise when the government forced it to subcontract with SPEC. There is no evidence of such recklessness or deviousness, and we find it far more plausible that IMC interpreted the RFP to mean what it said: all work on the DDC system would be performed, and could

11

*only* be performed, by an unnamed provider with whom the government had an existing contract to perform just such work.

IMC's inclusion of $43,000 for controls in its internal project budget does not support the government's position. The cost of the DDC system was $283,000, more than six times the amount in IMC's budget (finding 17). This tends to support the conclusion that IMC was expecting only to coordinate with the government's DDC system provider, not provide the system itself. Likewise, the fact that IMC's initial and preliminary schedules included amounts totaling less than $87,000 for "Controls and Wiring" and "Final Controls Connection and Programming" does not support the conclusion that IMC understood it was required to provide a $283,000 DDC system. IMC's post-award communications with SPEC are also consistent with IMC learning for the first time after award that the government expected it to subcontract with SPEC.

The government also contends that at least one other bidder interpreted the RFP to require the contractor to subcontract the DDC control system work to SPEC. It cites evidence that, shortly before the task order proposals were due, SPEC provided proposals to perform the same work to two mechanical contractors (*see* finding 18). This, however, does not show that the government's interpretation was shared by another bidder or, more importantly, that its interpretation is either correct or reasonable. To begin with, there is no evidence that any actual offeror for the task order submitted a proposal indicating it intended to subcontract the work to SPEC (*id.*). If there were such a proposal, the government has not presented it to us. Second, even if it could be shown that some other offeror understood that the government expected it to subcontract the DDC control work to SPEC, the government presents no evidence that such an understanding was based solely on the language in the RFP, rather than some other source. Indeed, it seems obvious that such an offeror would have been privy to key information outside the RFP, because no offeror could discern from the RFP alone that SPEC was the referenced provider.[2] Therefore, we are not persuaded that another bidder interpreted the RFP as the government does or that, even if it did, that fact sheds useful light on the intent of the parties before us.

While the government asks us to infer from extrinsic evidence that IMC understood from the beginning that it was required to subcontract the DDC system work

---

[2] Certain emails between SPEC and one of the mechanical contractors suggest that they were working together on other government projects, which would explain how the mechanical contractor knew that SPEC would be the provider for the Maxwell project (R4, tabs G-06 at 3-6). It might also explain how the mechanical contractor knew that the government would expect the contractor on this job to perform the DDS system work through SPEC, despite the RFP's failure to say so.

to the government's provider, it has not pointed to any evidence that the government, itself, interpreted the task order that way at the time of award. For example, the government did not provide an affidavit from the contracting officer testifying that the government's intent at the time of award was for the contractor to subcontract the DDC system work to SPEC (or explaining why the contract did not say so). A strong indication to the contrary is the fact that the government awarded IMC the task order despite IMC's unequivocal representation that it intended to self-perform 100% of the work and thus use no subcontractors at all (finding 12). If the government believed the awarded task order would require the contractor to install the DDC system through a subcontract, it presumably would have rejected IMC's proposal as non-compliant with the RFP.

Accordingly, the extrinsic evidence does not change our conclusion that the best reading of the task order is that it did not require IMC to provide the DDC system.

## V. *Contra Proferentum*

The result also does not change even if we assume the task order language is ambiguous and that the extrinsic evidence does not resolve that ambiguity. In that event, we would resort to the *contra proferentum* doctrine, and construe the task order against the government as the drafter of the disputed language. *Gardiner*, 467 F.3d at 1352-53. The doctrine is particularly apt in this case, where the government could easily have made plain that it intended for the contractor to provide the DDC system through a subcontract with SPEC. The consequences of the government's poor drafting should fall on the government, not the contractor.

The government argues that the "patent ambiguity" exception to *contra proferentun* applies here. Any ambiguity in the task order, however, was not so glaring and obvious that it rose to the level of a patent ambiguity that IMC should have raised before submitting a proposal. The drafters of the task order here "wholly failed to convey" the government's intent. *Blinderman Const. Co. v. United States*, 695 F.2d 552, 558 (Fed. Cir. 1982). IMC was not required to anticipate that the government may be intending something quite different from what it stated in the RFP. Unlike the situation in *JAAAT*, the task order contained no statement flatly contradicting IMC's interpretation that the DDC system was outside its scope, which would give rise to a duty to inquire. Because IMC's interpretation of the language was reasonable and any confusion solely the government's fault, we would construe it against the government even if we found it ambiguous.

## VI. **Quantum**

The government does not dispute that IMC paid SPEC $283,000 for the DDC system work.  The government has raised no issue regarding IMC's markup of 15.5% for overhead and profit.  Accordingly, we find that IMC is entitled to an equitable adjustment to the task order price in the amount of $326,865.

<u>CONCLUSION</u>

The appeal is sustained in the amount of $326,865, with interest under 41 U.S.C. § 7109, from September 24, 2019, until the date of payment.

Dated:  March 29, 2023

THOMAS P. MCLISH
Administrative Judge
Armed Services Board
of Contract Appeals

I <u>concur</u>

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I <u>concur</u>

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

14

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 62422, Appeal of IMC Construction Group, rendered in conformance with the Board's Charter.

Dated:  March 30, 2023

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals